## J.G. Wentworth S.S.C. Limited Partnership, Plaintiff-Appellant,†

### v.

## Sean Edward Callahan, Sentry Insurance, a mutual company, and Sentry Life Insurance Company, Defendants-Respondents.

Court of Appeals

*No. 01–2756. Submitted on briefs March 28, 2002.—Decided June 25, 2002.*

### 2002 WI App 183

(Also reported in 649 N.W.2d 694.)

---

† Petition to review denied 10-21-02.

---

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *David P. Muth* of *Quarles & Brady LLP*, of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *James M. Fredericks* of *Borgelt, Powell, Peterson & Frauen, S.C.*, of Milwaukee.

Before Fine, Schudson and Curley, JJ.

¶ 1. CURLEY, J. J.G. Wentworth, S.S.C., Limited Partnership (Wentworth) appeals the trial court's denial of its summary judgment motion in its declaratory judgment action seeking a ruling that the anti-assignment clause in the annuity agreement between Sean Edward Callahan and Sentry Insurance A Mutual Company (Sentry) is unenforceable. The dispute arose after Callahan assigned his future payments, obtained in a structured settlement of a products liability suit, to Settlement Capitol Corporation (Settlement), which, in turn, assigned them to Wentworth. For two reasons, we agree with the trial court's determination that the assignments were void, and affirm the denial of summary judgment. First, the clear and unambiguous language found in the structured settlement agreement prohibited Callahan from assigning the future payments. Second, the non-assignability language was necessary to take advantage of certain tax benefits.

## I. BACKGROUND.

¶ 2. In June 1992, Callahan settled a products liability accident case with Sentry, the tortfeasors' insurance company, for injuries he received in a rotary

mower accident. Callahan and Sentry entered into a settlement agreement and release that obligated Sentry to purchase an annuity from Sentry Life Insurance Company (Sentry Life), providing Callahan with monthly payments of $1225 starting July 1, 1992, for the remainder of his life, with a guaranteed minimum of 240 monthly payments. This guaranteed Callahan a minimum of $294,000.

¶ 3. Several years later, Callahan and Settlement entered into a series of purchase agreements in which Settlement purchased all of Callahan's future payments in an exchange for a lump sum.[1] Because Callahan's original agreement with Sentry contained a non-assignability clause prohibiting him from assigning his future payments, Callahan, to facilitate the purchase agreement, gave Settlement a notarized instruction letter which ordered Sentry Life to send the annuity checks to Settlement's address. Callahan also represented that he would not make any changes to the instructions to Sentry Life as to where the payments should be directed. Finally, Callahan agreed that he would never interfere with Settlement's right to receive and collect the payments.

---

[1] Originally, Settlement purchased $650 of Callahan's future monthly $1225 payment for payments due from July 1, 1996, through June 1, 2008. An amendment to the agreement was executed entitling Settlement to receive an additional $275 of the $1225 payment for the same time period as the initial agreement. Finally, another amendment was entered into by Callahan and Settlement in which Settlement purchased the remaining $300 of the $1225 monthly payment. This amendment extended the $300 monthly payments assignment until July 1, 2011. Altogether, Settlement paid Callahan approximately $57,000 for his future monthly payments.

¶ 4. Shortly thereafter, Settlement assigned its interest in Callahan's future payments from Sentry Life to Wentworth. Wentworth was aware of the non-assignability clause in the settlement agreement. This arrangement continued until August 1, 1997, when the payments to Wentworth stopped. Consequently, Wentworth sued Callahan in Pennsylvania and obtained a default judgment against him. Wentworth then docketed the Pennsylvania judgment in the Milwaukee County Circuit Court and attempted to garnish Callahan's payments. Sentry Life resisted the garnishment on several different grounds, including its contention that the annuity contract contained a prohibition against any assignments and that the payments were not subject to a garnishment action. Ultimately, the garnishment action was dismissed. Wentworth then commenced a declaratory judgment suit against Callahan, Sentry, and Sentry Life seeking to enforce Callahan's agreement. The trial court found that the purchase agreements assigning the rights to Callahan's future payments were void due to the non-assignability clause in the annuity contract, and refused to grant Wentworth's summary judgment motion.

## II. ANALYSIS.

¶ 5. Wentworth contends that the trial court erred. First, Wentworth acknowledges that language in the settlement agreement does purport to prohibit Callahan's ability to assign his rights to future payments. However, Wentworth, noting that contracts are generally assignable, submits that the "modern" trend in the law is to find that the existence of non-assignability language in a contract does not void an assignment; rather, such language merely gives the obligor a cause of action for damages resulting from the

assignment. Wentworth asserts that the position of the RESTATEMENT (SECOND) OF CONTRACTS on the issue, as well as foreign law, supports its contention. Second, Wentworth argues that public policy favors the assignment of contracts. We disagree with Wentworth's first contention and, because it is dispositive, we decline to address the second argument. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (stating that if a decision on one point disposes of the appeal, the appellate court need not decide other issues).

■

¶ 6. The interpretation of a contract presents a question of law, which is reviewed by this court *de novo*. *See Northern States Power Co. v. Nat'l Gas Co.*, 232 Wis. 2d 541, 545, 606 N.W.2d 613 (Ct. App. 1999).

¶ 7. The disputed provisions in the settlement agreement and release entered into by Callahan and Sentry read:

> The future periodic payments cannot be accelerated, deferred, increased or decreased by Sean E. Callahan or any beneficiary designated and no part of the payments called for herein or any specific assets of the insurer are to be subject to execution of any legal process for any obligation in any manner, *nor shall Sean E. Callahan or any beneficiary have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or any part thereof by assignment or otherwise.*

(Emphasis added.)

¶ 8. Wentworth argues that, inasmuch as the "modern" trend in the law is not to invalidate an assignment when contract language purports to prohibit assigning it to another, but instead, permits the obligor to sue for damages arising out of the assign-

ment, the trial court erred in finding that the Callahan/Sentry settlement language rendered the assignments void.

¶ 9. Wentworth looks to the RESTATEMENT (SECOND) OF CONTRACTS § 317(2), which lists the exceptions to the general rule that contracts are assignable:

**Assignment of a right.**

. . . .

(2) A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

(c) assignment is validly precluded by contract.

RESTATEMENT (SECOND) OF CONTRACTS § 317(2). Wentworth contends that although sub. (c) is potentially relevant, that exception does not render the assignment void. Wentworth posits that sub. (c) is subject to the RESTATEMENT (SECOND) OF CONTRACTS § 322(2)(b), which gives an obligor a right to damages for the breach of the anti-assignment clause, but does not make the assignment void. Section 322(2)(b) reads: "A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested . . . gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective." Therefore, Wentworth concludes that although

813

the contract term prohibiting Callahan from assigning his future payments gives Sentry a right to damages, it does not render Callahan's assignments unenforceable.

¶ 10. While Wentworth concedes that the RESTATEMENT (SECOND) OF CONTRACTS § 317(2)(c) explicitly states that a contract can contain language that absolutely prohibits assignments altogether, and, in such a case, the assignment is unenforceable, it submits that absent clear, definite, and appropriate contract language stating that an assignment is void or invalid, an assignment is enforceable. *See generally Pro Cardiaco Pronto Socorro Cardiologica, S.A. v. Trussell*, 863 F. Supp. 135, 138 (S.D.N.Y. 1994) ("[A]ssignments are enforceable unless expressly made void."); *Garden State Bldgs., L.P. v. First Fid. Bank, N.A.*, 702 A.2d 1315, 1321 (N.J. Super. Ct. App. Div. 1997) (" '[T]o reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, such clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way.' "). Wentworth posits that because no such language is contained in the settlement agreement between Callahan and Sentry, the assignment is valid and enforceable. We are not persuaded.

¶ 11. No Wisconsin case has addressed this issue. Thus, we first look to the contract language to ascertain the parties' intent, as our goal in scrutinizing a contract is to determine and give effect to the parties' intentions. *See Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶ 23, 233 Wis. 2d 314, 607 N.W.2d 276; *Eden Stone Co. v. Oakfield Stone Co.*, 166 Wis. 2d 105, 116, 479 N.W.2d 557 (Ct. App. 1991). If the terms of a contract are plain and unambiguous, we construe the

contract as it stands and apply its literal meaning. *Wisconsin Label*, 2000 WI 26 at ¶ 24. However, if we determine that a contract provision is ambiguous, we will look to extrinsic evidence to discern the contract's meaning. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). A contract is ambiguous where its terms are reasonably susceptible to more than one interpretation. *Id.*

¶ 12. Here, the language is not ambiguous. The clause prohibits Callahan from accelerating, deferring, increasing or decreasing the payments and forbids him from selling or mortgaging or encumbering same, or assigning any part thereof. Clearly, the parties' intent was to prohibit Callahan from modifying the flow and timing of the payments or from assigning the future periodic payments. Nothing in the contract language can be reasonably read to exempt Callahan from the prohibited assignment. Having determined that the parties bargained for a contract restricting Callahan's assignment of his future payments, we next determine whether this prohibition voids the assignments.

¶ 13. As noted, Wentworth, relying principally on the RESTATEMENT (SECOND) OF CONTRACTS § 322 and the cases that follow, claims that the assignments here are not void, they simply "give[] the obligor [Sentry] a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective." Although the Settlement Agreement does not contain the words "void" or "invalid," we are satisfied that, under the circumstances presented here, the assignments are unenforceable.

¶ 14. First, contrary to Wentworth's assertion, our review of case law compels us to conclude that the

815

"modern" trend is to enforce non-assignability clauses when they appear in structured settlements. *See, e.g., CGU Life Ins. Co. v. Singer Asset Fin. Co.*, 553 S.E.2d 8 (Ga. Ct. App. 2001); *In re Kaufman*, 37 P.3d 845 (Okla. 2001); *Shaffer v. Liberty Life Assurance Co. of Boston*, 746 N.E.2d 285 (Ill. App. Ct. 2001); *Wentworth v. Jones*, 28 S.W.3d 309 (Ky. Ct. App. 2000); *Green v. Safeco Life Ins. Co.*, 727 N.E.2d 393 (Ill. App. Ct. 2000); *In re Nitz*, 739 N.E.2d 93 (Ill. App. Ct. 2000). Ironically, one such case, *Wentworth v. Jones*, 28 S.W.3d 309 (Ky. Ct. App. 2000), involves the same corporation, Wentworth. There, the court, in refusing to uphold the assignment, opined:

> However, we find the annuity contracts involved in this case to be of a unique character and, therefore, distinguishable from all other species of contracts—especially with respect to the issue of assignability. We are persuaded that the attempt by Wentworth to enforce its putative assignments from these tort victims must fail based on our analysis of pertinent provisions of the Internal Revenue Code, Kentucky garnishment statutes, the Kentucky Insurance Code, and public policy considerations.

*Id.* at 313. Ultimately, the Kentucky court concluded: "The interest obtained by Wentworth by its attempted assignment agreements with these payees was wholly illusory." *Id.* at 314.

¶ 15. Despite Wentworth's arguments to the contrary, we are disinclined to require "magic" words in order to enforce a non-assignability clause. When the language is clear on its face, we see no reason to require a specific word or clause in order to enforce the parties' clear intention. Words should be given their ordinary meaning and unsuspecting parties should not have to resort to a secret code in order to write enforceable

contracts. Here, the parties bargained for an agreement that prohibited Callahan from assigning his future periodic payments to another: "[N]or shall Callahan . . . have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or part thereof by assignment or otherwise." Despite the lack of the words "void" or "invalid," this language does not suggest that the parties intended to allow Callahan to assign his future interests in exchange for Sentry's being given the right to sue for damages.

¶ 16. Apparently, the anti-assignment language was incorporated into agreements of this type to protect tort victims from going on spending sprees. As explained by the Kentucky Court of Appeals, the Internal Revenue Code recognizes and accommodates this policy interest:

> In order that the payments not be treated as taxable income, the payees' only possessory interest in the proceeds had to consist of *periodic* payments as opposed to any other form of receipt—thus assuring a continuing cushion of income to prevent "binging away" of an asset that would effectively render tort victims indigent. In consideration for the ability to guarantee adequate income for this protected class of beneficiaries, the Internal Revenue Code provided for one qualified assignment of liability for making the periodic payments to a qualified assignee.

*Id.* at 313. This observation was amplified in *Nitz*: "Under this language, in order to receive the favorable tax treatment accorded structured settlement agreements, the structured settlement recipient can receive the settlement payments only when they are due and cannot accelerate the payments or otherwise derive present economic benefit from payments due in the future." *Nitz*, 739 N.E.2d at 99 (citations omitted).

817

¶ 17. The dispute in *Nitz* is identical to that here. Nitz entered into an agreement with an insurance company in order to settle a negligence action. The settlement agreement gave Nitz a life annuity. The agreement contains language similar to that found in the Sentry/Callahan agreement:

> Said payments to Plaintiff required herein cannot be accelerated, deferred, increased or decreased by the Plaintiff and no part of the payments called for herein or any assets of the Defendant and/or the Insurer is to be subject to execution or any legal process for any obligation in any manner, *nor shall the Plaintiff have the power to sell or mortgage or encumber same or any part thereof, not anticipate the same, or any part thereof, by assignment or otherwise.*

*Id.* at 96. Nitz commenced an action seeking court approval because of the existence of an Illinois statute requiring the court's permission in order to assign the future payments in an annuity agreement. In overturning the trial court's decision approving the assignment, the court found that such anti-assignment provisions were enforceable and the petitioner's attempted assignment of future payments was invalid. The court first observed that an "antiassignment provision was a bargained-for provision that was intended to benefit all parties and, therefore, was enforceable against [the assignor]." *Id.* at 100. Further, in addressing an argument similar to that presented by Wentworth in the instant case, that Wisconsin favors free assignments because it has adopted U.C.C. § 9–318 (1992), the court commented that the court's ruling did not fly in the face of Article 9 of the Uniform Commercial Code because annuity policies fall outside the U.C.C.:

> [T]he Commercial Code expressly excludes from article 9 'a transfer of an interest or claim in or under any policy of insurance, except as provided with respect to proceeds ... and priorities in proceeds.' An 'annuity policy' is an 'insurance policy providing for monthly or periodic payments to the insured.' Accordingly, article 9 does not apply to annuity policies, such as the one here.

*Id.* at 101–02 (citation omitted). Further, we note that a contract settling a tort action is not an ordinary commercial transaction regulated by the U.C.C., such as one might find in a contract between two businesses. Although we note that several cases have interpreted anti-assignment clauses differently, and some have determined that the obligor was entitled to sue for damages, we find the analysis of *Nitz* to be the better reasoned. Thus, we adopt it.

¶ 18. Additionally, like Wentworth's Kentucky case that addressed similar anti-assignment language, the anti-assignment language in the instant case was inextricably linked to favorable tax treatment for both parties. Similar to the Kentucky contract, here, the sentence preceding the prohibitions on the future payments references the same provision of the Internal Revenue Code: "All sums set forth herein constitute damages on account of personal injuries and sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended." Thus, we conclude that the language limiting the payments in a number of ways, including prohibiting their assignment, was included to preserve their tax-preferred status.[2] This is an additional reason for finding the assignments void.

---

[2] Wentworth argues that any concern that an assignment jeopardized the intended preferential tax treatment is put to bed by the passage of the Victims of Terrorism Tax Relief Act of 2001. We remain unpersuaded by this argument, and, in any

Consequently, we are satisfied that not only the language, standing by itself, makes the assignments unenforceable, but also, here, the parties needed to assure any assignment would be void in order to continue the future payments' tax code eligibility.

¶ 19. Thus, we are satisfied that the anti-assignment language was intended to retain a favorable tax provision and, as such, the clear and unambiguous language prohibiting any assignments was enforceable.[3] Accordingly, we affirm.

*By the Court.*—Judgment affirmed.

event, the parties' intent and the existing law at the time the contract was entered controls our analysis.

[3] While we decline to address the public policy issue raised by Wentworth, we find the comments of the Illinois court discussing the legislature's decision to protect structured settlement recipients bear repeating. "The legislature was concerned that such persons were accepting offers of ready, but deeply discounted, cash from companies in exchange for their settlement annuity payments and then ending up penniless and without resources in the future." *In re Nitz*, 739 N.E.2d 93, 97 (Ill. App. Ct. 2000).