# BV/B1, LLC, Plaintiff-Appellant,

v.

## InvestorsBank, Defendant-Respondent.

Court of Appeals

*No. 2009AP2721. Submitted on briefs September 7, 2010.
—Decided October 26, 2010.*

2010 WI App 152

(Also reported in 792 N.W.2d 622.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Kathy L. Nusslock* and *Gregory J. Sell* of *Davis & Kuelthau, S.C.*, and *Beth Ermatinger Hanan* of *Gass Weber Mullins LLC*, Milwaukee.

465

On behalf of the defendant-respondent, the cause was submitted on the brief of *Dean P. Laing* of *O'Neil, Cannon, Hollman, DeJong & Laing S.C.*, Milwaukee.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. BV/B1, LLC, appeals from a declaratory judgment awarding InvestorsBank $833,798.52 in prepayment penalty fees following a summary judgment hearing. BV/B1 argues that the clause on which the circuit court relied is subject to at least four different logical interpretations, thereby making the clause ambiguous and inappropriate for construction on summary judgment. BV/B1 also argues that the circuit court erred in failing to conclude that InvestorsBank waived its right to counterclaim for additional monies after accepting BV/B1's payment and releasing the collateral property. We disagree on both grounds and affirm.

## BACKGROUND

¶ 2. BV/B1 is a limited liability company formed in 2004. Originally, BV/B1 had four members: Boulder Venture 13, LLC; Jeffrey Metz; Brian Byrne; and John Lubotsky. The members of Boulder Venture were Robert E. Schmidt, III; Sharon Bell; and Crista Wojack. InvestorsBank is a financial institution located in Waukesha, Wisconsin and is engaged in commercial lending.

¶ 3. In late 2004, BV/B1 began shopping around for permanent financing for a commercial building it was constructing in Fond du Lac, Wisconsin. BV/B1 approached TCF Bank for a loan. TCF Bank was willing to provide BV/B1 with a $4.8 million loan, with a term of ten years, at a fixed interest rate of 6.87%, but would

require personal guarantees of BV/B1's members, which it would cap at ten percent of the loan amount.

¶ 4. BV/B1 then approached InvestorsBank who held the construction loan on the building to see if it would be willing to provide more favorable terms. George Schonath, InvestorsBank's president,[1] told BV/B1 that InvestorsBank was willing to provide BV/B1 with a $4.85 million loan, with a term of ten years, at a fixed interest rate of 6.75%, with no personal guaranties. In lieu of personal guaranties, however, Investors-Bank required a prepayment penalty if the loan was paid before maturity.

¶ 5. Schonath personally drafted a unique prepayment penalty provision for its loan with BV/B1 that had not previously been utilized by InvestorsBank. Investors Bank's standard prepayment penalty provision at that

---

[1] Although Schonath drafted the contract clause at issue and appears to be the representative from InvestorsBank who primarily negotiated the terms of the contract with BV/B1, he did not testify at the summary judgment hearing and was not deposed, because, unfortunately, he passed away prior to discovery. Multiple witnesses testified both in depositions and at the summary judgment hearing regarding their transactions and communications with Schonath. However, because BV/B1 does not challenge that evidence on appeal, we do not address its admissibility under the dead man's statute. *See* Wis Stat. § 885.16 (2007–08); *see also Bell v. Neugart*, 2002 WI App 180, ¶ 17, 256 Wis. 2d 969, 650 N.W.2d 52 (stating that "[a]lthough the wording of the [dead man's] statute [§ 885.16] is cumbersome, the core meaning is that it disqualifies a witness to a transaction or communication with a decedent from testifying about that transaction or communication in his or her favor, or in the favor of any party to the case claiming under the witness").

All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

time provided for a prepayment penalty of ninety days interest on the outstanding principal balance of the loan on the date of repayment, if the loan was refinanced with another financial institution. The term loan given to BV/B1, however, was unique in many respects, including: (1) it locked in an interest rate for ten years, which is unusual in commercial real estate; (2) it provided an interest rate below the market rate; and (3) it required no personal guarantees, which was highly unusual in commercial real estate and which poses substantial risk for the lender.

¶ 6. After extensive negotiation over the terms of the loan, including the addition of an eighteen-month grace period, which permitted BV/B1 to sell the building without incurring a prepayment penalty, the parties agreed on the following prepayment penalty clause:

> If the loan is prepaid in full or in part at any time on or before July 30, 2006 there shall be no prepayment penalty. If the loan is prepaid in full or in part at any time after July 30, 2006 or if the prepayment is the result of an acceleration due to an event of default, *the prepayment penalty shall be equal to the fixed rate on the loan minus the yield on a US Treasury Bond with a maturity similar to the number of years remaining on the fixed rate loan plus 2.5% times the number of years remaining at a fixed rate times the outstanding principal balance of the loan.*

(Emphasis added.)

¶ 7. As the grace period in the prepayment penalty provision was coming to an end, BV/B1 had not sold the building nor had it requested an extension of the grace period from InvestorsBank. In February 2007, after the grace period had expired, Graff/Goldman Interests, Inc., secured an option to purchase the build-

ing and interest in the lease. Graff/Goldman subsequently exercised the option.

¶ 8. BV/B1 informed InvestorsBank of the intended sale to Graff/Goldman on September 14, 2007. On that same day, Sarah Frantz, a loan administrator for InvestorsBank, prepared a payoff letter that she believed reflected the principal and interest due on the term loan. Frantz assumed that InvestorsBank's standard prepayment penalty clause applied, which would have resulted in no prepayment penalty fee. The letter, which was sent to BV/B1, advised BV/B1 that the total payoff amount was $4,523,073.69: $4,507,019.43 constituting the remaining balance on the loan and $16,054.26 in interest. The letter explicitly stated that no prepayment penalty fee was being assessed.

¶ 9. Schonath soon realized that Frantz had applied the wrong prepayment penalty clause and instructed her to send a revised payoff letter to BV/B1 based upon the clause the parties drafted specifically for the BV/B1 loan. Frantz emailed BV/B1 the revised payoff letter, advising BV/B1 of InvestorsBank's error. The revised payoff letter informed BV/B1 that in addition to the $4,523,073.69, BV/B1 owed $1,630,909.90 in prepayment penalty fees for a total payoff amount of $6,153,983.59.

¶ 10. On behalf of BV/B1, Schmidt attempted to negotiate the prepayment penalty, and set up a meeting with Schonath. During the meeting, Schmidt stated that BV/B1 would not be able to close on its deal with Graff/Goldman if assessed the $1.6 million prepayment penalty fee. As a result, Schmidt asserted that BV/B1 would be sued by Graff/Goldman, which would only "make the situation . . . ugl[y] for everyone."

¶ 11. After the meeting, Schonath considered reducing the prepayment penalty fee in hopes of main-

taining a long-term relationship with Boulder Venture and Schmidt. The next morning, InvestorsBank emailed a second revised payoff letter to BV/B1. The letter set forth a new prepayment penalty fee of $797,111.38, calculated by removing the "plus 2.5%" variable from the prepayment penalty clause. Accordingly, InvestorsBank set the new total payoff amount on the loan at $5,321,030.14: the $4,507,019.43 loan balance, plus $16,899.33 in loan interest,[2] plus the $797,111.38 reduced prepayment penalty fee. Schmidt was not satisfied with the reduced prepayment penalty fee, but he decided to pay the reduced amount in order to close on the sale of the property with Graff/Goldman.

¶ 12. On September 21, 2007, during the closing, BV/B1 wired $5,323,565.35 to InvestorsBank to pay off the loan. That amount comprised of $4,507,019.43 in remaining principal, $19,434.54 in interest, and the $797,111.38 reduced prepayment penalty fee. Immediately after the closing, BV/B1 faxed a letter to InvestorsBank, which stated that BV/B1 reserved its right "to contest the validity and enforceability of the prepayment penalty" fee. On September 25, 2007, InvestorsBank provided BV/B1 with a document entitled "SATISFACTION OF LEAS[E]HOLD REAL ESTATE MORTGAGE – BY LENDER," stating that the loan was "satisfied and released as security."

¶ 13. BV/B1 faxed another letter to InvestorsBank on October 8, 2007, stating that BV/B1 sought immediate return of the reduced prepayment penalty fee—$797,111.38—and that if the funds were not returned by October 15, 2007, BV/B1 would commence litigation. InvestorsBank did not return the prepayment penalty fee.

---

[2] The interest amount had grown since InvestorsBank's last payoff letter, reflecting the additional time that had passed.

¶ 14. Thereafter, BV/B1 filed a declaratory judgment action asking the court to declare that, as a matter of law, the prepayment penalty clause in the parties' contract did not impose a prepayment penalty fee in this instance. InvestorsBank counterclaimed, alleging that it was entitled to the entire $1,630,909.90 prepayment penalty fee set forth in its first revised payoff letter to BV/B1. Accordingly, InvestorsBank demanded judgment be entered in the amount of $833,798.52—the amount it claimed it was due less the reduced prepayment penalty fee already paid by BV/B1. InvestorsBank also requested prejudgment interest, attorney fees, and costs.

¶ 15. InvestorsBank moved for summary judgment, seeking dismissal of BV/B1's complaint and for judgment on its counterclaim. BV/B1 also filed a motion for summary judgment, seeking dismissal of Investors Bank's counterclaim on the grounds that InvestorsBank waived any right it may have had to claim additional monies due from BV/B1 when it accepted the payment and released the collateral.

¶ 16. After a hearing on the parties' motions, the circuit court found the case appropriate for summary judgment and awarded InvestorsBank over $1.6 million, comprised of the remainder of the prepayment penalty fee and prejudgment interest. BV/B1 appeals.

¶ 17. Additional facts are included in the remainder of the decision as necessary.

## STANDARD OF REVIEW

■■

¶ 18. This case arises out of the circuit court's decision on cross-motions for summary judgment. Our review in cases on appeal from summary judgment is well-known. We review the denial or grant of a sum-

mary judgment motion *de novo,* employing the same methodology as the trial court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). We must grant summary judgment if the record demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Wis. Stat. § 802.08(2).

■

¶ 19. BV/B1's claims require us to construe the parties' prepayment penalty clause. The interpretation of a contract is a question of law that we review independently of the circuit court. *Ehlinger v. Hauser,* 2008 WI App 123, ¶ 19, 313 Wis. 2d 718, *aff'd,* 2010 WI 54, 325 Wis. 2d 287, 785 N.W.2d 328. "If the terms of a contract are plain and unambiguous, we construe the contract as it stands and apply its literal meaning." *J.G. Wentworth S.S.C. Ltd. P'ship v. Callahan,* 2002 WI App 183, ¶ 11, 256 Wis. 2d 807, 649 N.W.2d 694. However, if we determine that a contract provision is ambiguous, we look to extrinsic evidence to discern the contract's meaning. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). A contract is ambiguous when its terms are reasonably susceptible to more than one interpretation. *Id.* However, when a court determines that a contract's terms are ambiguous and the intent of the parties is in dispute, summary judgment is not appropriate. *Energy Complexes, Inc. v. Eau Claire County,* 152 Wis. 2d 453, 466–67, 449 N.W.2d 35 (1989).

## DISCUSSION

¶ 20. BV/B1 asks this court to overturn the judgment and to remand the case back to the circuit court for trial because it claims the prepayment penalty

clause is ambiguous and therefore the clause cannot be construed on summary judgment. BV/B1 also claims that InvestorsBank waived its ability to seek an increased prepayment penalty when it accepted BV/B1's reduced prepayment penalty and released the security. We address each argument in turn.

## I. Prepayment Penalty Clause

¶ 21. BV/B1 first argues that the circuit court erred in granting summary judgment because the evidence at the hearing demonstrated that reasonable people interpret the prepayment penalty clause differently. The relevant portion of the prepayment penalty clause is as follows:

> the prepayment penalty shall be equal to the fixed rate on the loan minus the yield on a US Treasury Bond with a maturity similar to the number of years remaining on the fixed rate loan plus 2.5% times the number of years remaining at a fixed rate times the outstanding principal balance of the loan.

¶ 22. The parties agree that the following numerical values are to be assigned to each variable:

- The fixed rate on the loan = 6.75%.
- The yield on a United States Treasury Bond with a maturity similar to the number of years remaining on the fixed rate loan = 4.36%.
- The number of years remaining at a fixed rate = 7.4.
- The outstanding principal of the loan = $4,507,019.43.

¶ 23. BV/B1 contends that the evidence at the hearing demonstrated that reasonable people reached four vastly different prepayment penalties when at-

473

tempting to apply the prepayment penalty clause: (1) $0, as set forth in the first payoff letter; (2) $797,111.38, as set forth in the second revised payoff letter; (3) $833,799, as set forth by BV/B1's expert, who applied mathematical order-of-operations principles; and (4) $1,630,909.90, as set forth in the first revised payoff letter. We address each interpretation in turn.

## A. *The First Payoff Letter*

¶ 24. BV/B1 argues that InvestorsBank's first payoff letter, setting the prepayment penalty at $0, demonstrates that InvestorsBank considered $0 as the correct interpretation of the contract language. Additionally, BV/B1 argues that $0 is a reasonable interpretation of the contract language given that it is commonly accepted in the industry that a prepayment penalty clause is "a form of yield maintenance that would not result in a penalty if interest rates stayed the same or went up." Because interest rates went up during the relevant time period—from 4.25% at the time the loan originated to 4.36% when BV/B1 paid off the balance—BV/B1 claims that the clause does not require it to pay a prepayment penalty fee. BV/B1 bases its understanding of the clause on "InvestorsBank's own statement when the concept of prepayment penalty fees was introduced, as well as the experience of BV/B1's individual members and employees."

¶ 25. When interpreting a contract clause, we begin with the plain language of the clause. *J.G. Wentworth S.S.C. Ltd. P'ship*, 256 Wis. 2d 807, ¶ 11. We only turn to extrinsic evidence when the plain terms of the contract are ambiguous. *Id.* However, BV/B1 claims

that "Wisconsin courts . . . will consider trade practice and custom in determining *whether* a provision is ambiguous." (Citing *Columbia Propane LP v. Wisconsin Gas Co.*, 2003 WI 38, ¶¶ 25–29, 261 Wis. 2d 70, 661 N.W.2d 776; emphasis added.) That is simply not an accurate recitation of Wisconsin law. *Columbia Propane* does not stand for that proposition, but rather stands for the proposition that "[c]ourts may resort to industry knowledge to construe ambiguous technical terms in a contract." *See* MICHAEL B. APFELD ET AL., CONTRACT LAW IN WISCONSIN § 5.40 (3d ed. 2008). Here, there are no ambiguous terms which necessitate turning to trade practices or industry usage.

¶ 26. Moreover, BV/B1 has not demonstrated that, based on the clause's language, a reasonable entity would understand that the prepayment penalty clause was "a form of yield maintenance" and that no prepayment penalty fee would be necessary "if interest rates stayed the same or went up." Telling, is this exchange between BV/B1 and the circuit court during the summary judgment hearing in which BV/B1 could not identify words in the clause that supported its argument:

> **THE COURT:** I am sorry, can you tell me how that calculation [resulting in a $0 prepayment penalty fee] is done using those words [in the clause]? In other words, the sentence is a sequence of words which follow in a particular order, follow each other and appear on a page in a particular order, and what I wonder is how you can use those words to mean that if the rate would rise, if interest rates would rise, then there is no prepayment penalty?
>
> . . . .
>
> **THE COURT:** Now, if we use the language of the clause, it says the prepayment penalty shall be equal to

the fixed rate on the loan minus the yield on the Treasury, and, of course, all together the fixed rate on the loan minus the yield for the Treasury, the Treasury rounded maturity similar to the number of years remaining on the fixed rate loan, and we know that that yield is 4.36 percent. So why wouldn't we add up those first three things, the fixed rate on the loan minus the 4.36 percent plus the 2.5 percent spread?

[BV/B1]: Because that's not the way that it's done in the industry. It's not what the clause meant. It's not what the clause is intended to mean.

. . . .

THE COURT: . . . The question that I have for you though is how do you get the words [of the clause] to say that, the actual words that Mr. Schonath, I believe, drafted and that your client signed apparently without reading it?

. . . .

THE COURT: *Can you just somehow use the sequence of operations to make your analysis work? . . . In this language, nothing says compare, you know, our yield to the current rate. It just doesn't say it. So can you make these words accomplish or, you know, the five different factors work together to accomplish what you are asking?*

. . . .

[BV/B1]: *Your Honor, I cannot point you to a word that says, for example, that the word percent means compare . . . .*

. . . .

THE COURT: *Here is the problem . . . [W]hat you are saying is it's ambiguous because a lot of people who were normally in this business . . . would actually add words to the language and apply that because it's standard. It's what the industry practice is. I say if the*

476

*words are invisible here, I don't know how I can do that. I have to follow the law, and the law says that people are bound by their own words, what they agree to. So, [BV/B1], can you tell me again how I can find those words here or how can I somehow utilize words that seem to me to be invisible?*

**[BV/B1]:** *. . . I can't tell you that you have to, you know, open the door behind the word "the" and then you get some different words that pop out at you.*

(Emphasis added.)

¶ 27. In essence, in asking us to find that the prepayment penalty clause dictates that no penalty would be incurred if interest rates went up, BV/B1 asks us to disregard the language set forth in the clause and, instead, simply compare the interest rate at the time the loan originated to the interest rate at the time BV/B1 paid off the loan. But that is not what the language of the clause directs us to do. BV/B1 is not an unsophisticated party. If it wished the prepayment penalty to hinge on a comparison of interest rates, it should have negotiated that language into the contract. It didn't, and now, it cannot go back in time and convince us that the language of the contract says something it doesn't.

¶ 28. BV/B1 also relies on multiple "expert" witnesses who testified that in their experience in the banking industry there should not have been a prepayment penalty because interest rates were higher when BV/B1 paid off the loan than they were when the loan originated. According to these witnesses, prepayment penalties are meant to protect the bank from economic hardship and that a bank will not be economically harmed if interest rates are higher at the time the loan is paid off.

477

¶ 29. BV/B1's purported "expert" testimony is irrelevant. The language of the contract clause is plain and unambiguous and it does not require "scientific, technical, or other specialized knowledge [to] assist the trier of fact to understand." *See* WIS. STAT. § 907.02. While the witnesses may have been qualified to testify about *typical* industry standards and about *typical* yield maintenance clauses, they were not necessary to determine what the language in *this* loan says.

¶ 30. The parties were free to contract to whatever terms they wished and were under no obligation to conform the terms of their contract to industry standards. Here, InvestorsBank was willing to extend a loan to BV/B1 with terms more favorable than those offered by TCF Bank. The loan offered by InvestorsBank had a more favorable interest rate, required no personal guarantees, and permitted an eighteen-month grace period within which BV/B1 could pay off the loan penalty-free. In exchange, InvestorsBank would receive a penalty fee if the loan was prepaid after the eighteen-month grace period. That is what the contract said, and BV/B1 cannot now turn to industry standards and trade usage to alter the language the parties carefully drafted and agreed to.

*B. Second Revised Payoff Letter*

¶ 31. In an attempt to show that the clause language is ambiguous, BV/B1 next seems to imply that the second revised payoff letter, in which InvestorsBank set forth the reduced prepayment penalty of $797,111.38, demonstrates another reasonable interpretation of the prepayment penalty clause. However, the record shows that in the second revised payoff letter InvestorsBank offered to reduce the prepayment penalty from

478

$1,630,909.90 to $797,111.38, not because the clause language led to the reduced prepayment penalty, but because InvestorsBank was offering to settle the parties' dispute. Accordingly, the second revised payoff letter does not set forth an interpretation of the prepayment penalty clause and therefore fails to support BV/B1's argument that the clause is ambiguous.

## C. Order of Operations

¶ 32. BV/B1 next attempts to demonstrate the ambiguity of the prepayment penalty clause by arguing that a reasonable person applying "basic order of operation principles taught to elementary school students" could arrive at a third interpretation of the prepayment penalty clause. BV/B1 argues that order-of-operations principles require multiplication and division to be performed before addition and subtraction, leading to the following calculation:

- 6.75% - 4.36% + (2.5% * 7.4 * $4,507, 019.43) =Prepayment Penalty.

- (6.75% - 4.36%) + $833,798.59 = Prepayment Penalty.

- (2.39% + $833,798.59) = $833,798.61.

The circuit court noted that the same result is produced when the formula is fed into an Excel spreadsheet program. However, even if we accept as true BV/B1's assertion that applying order-of-operations principles leads to an $833,798.61 prepayment penalty, the plain language of the clause does not direct us to apply order-of-operations principles.

¶ 33. To begin, we note that neither BV/B1 nor InvestorsBank argue that the parties intended for the clause to be interpreted in this manner. In fact, both parties agreed before the circuit court that they did *not* intend for the clause to be read in congruence with order-of-operations principles.[3] We fail to see how an interpretation can be considered reasonable if all parties involved agree the interpretation was not their intent.

¶ 34. Second, again turning to the words of the clause, the words do not support interpreting the clause as applying the order-of-operations principles. The formula by which the parties intended to calculate the prepayment penalty was written in prose and prose is read from left to right. It makes no sense that the parties intended for the actions in their sentence to be performed in an order other than the one in which they were written.

¶ 35. Third, and most importantly, applying order-of-operations principles here mixes apples and oranges. There are three elements to this and all loans: (1) the interest rate components; (2) the term length; and (3) the amount borrowed. Here, applying the mathematical order-of-operations principles, without regard to the function of each numerical value— that is whether the variable is a component of the interest rate, the term length, or amount borrowed— inappropriately mixes functions. In other words, a component of the interest rate, the 2.5% variable, is

___

[3] During the summary judgment hearing, counsel for BV/B1 made the following admission: "As the Court pointed out, that [order-of-operations principles] creates an absurd result, and I agree with [counsel for InvestorsBank]. Maybe the only . . . thing I do agree with him on today is that neither of the parties intended to have a contract with an absurd result[.]"

multiplied by the length of the term, 7.4 years, without regard to 2.5%'s relationship to the first two components of the interest rate. All three components of the interest rate must first be worked through to determine the interest rate before the interest rate can be combined with the second element, the remaining term.

¶ 36. Finally, as noted by the circuit court, this calculation produces a second absurd result because it makes the first two variables essentially superfluous, i.e., the first two variables, 6.75% - 4.36%, become 2.39%, and add only two cents to the total prepayment penalty. *See D'Angelo v. Cornell Paperboard Products Co.*, 59 Wis. 2d 46, 50, 207 N.W.2d 846 (1973) (A "contract should be construed whenever possible so that each sentence, phrase or word used will have some meaning, and none of the language discarded as superfluous or meaningless."). As noted by the circuit court:

I just cannot see that this problem [applying order-of-operations principles] can be solved in anything but a nonsensical way where you are telling me that the percentage, which is 2.39 percent, really means two cents and 39 percent of a penny, 2.39 cents, on this dollar figure, and I say that doesn't make any sense at all to me.

¶ 37. We agree, and conclude that a reasonable person would not interpret the clause to require application of order-of-operations principles.

*D. The First Revised Payoff Letter*

¶ 38. The final interpretation of the prepayment penalty clause, albeit an interpretation that BV/B1 argues is ultimately incorrect, is the one set forth in the first revised payoff letter and is the one adopted by the circuit court. That interpretation plugs the numerical

481

values into the equation set forth by the contract and takes each in turn, from left to right, logically grouping together the elements of the clause (interest rate component, length of term, and remaining principal), as follows: (6.75% - 4.36% + 2.5%) * 7.4 * $4,507,019[4] = $1,630,909.90.

¶ 39. We agree with the circuit court that this is a reasonable interpretation of the prepayment penalty clause's terms. This interpretation is reasonable because it follows the order of the language of the clause and takes each element of the loan in turn: first the interest rate, then the term length, and then the remaining principal.

¶ 40. In other words, tracking the language of the clause, first, we must determine the interest rate of the loan by taking the "fixed rate on the loan," 6.75%, and subtracting the "yield on a US Treasury Bond with a maturity similar to the number of years remaining on the fixed rate loan," 4.36%, and adding 2.5%, which results in 4.89%. Then, we multiply the 4.89% interest rate by "the number of years remaining at a fixed rate" by "the outstanding principal balance of the loan." The prepayment penalty that results is $1,630.909.90.

¶ 41. However, BV/B1 argues that this interpretation, even if reasonable on its face, is unreasonable in practice because it ignores trade practice, makes no economic sense, and applies a punitive penalty. As we have set forth previously, trade practice is irrelevant to our analysis of the prepayment penalty clause because the terms of the clause are plain and unambiguous.

---

[4] When calculating the prepayment penalty in the first revised payoff letter, InvestorsBank rounded the remaining principal due on the loan to the nearest dollar.

Further, we are unpersuaded that the clause makes no economic sense or is unreasonable simply because it imposes a steep penalty for prepayment.

¶ 42. In its attempt to persuade us that the circuit court's interpretation is unreasonable because it does not make economic sense, BV/B1 directs our attention to the Seventh Circuit Court of Appeals' decision in *BKCAP, LLC v. CAPTEC Franchise Trust 2000–1*, 572 F.3d 353 (7th Cir. 2009). BV/B1 argues that in *BKCAP* the court, "[a]pplying principles consistent with those applied by the Wisconsin courts, . . . found . . . [a contract's] prepayment language clear, but refused to adopt an interpretation [of that clause] that would render the clause absurd and without meaning." Likening this case to *BKCAP*, BV/B1 contends that the circuit court's interpretation of the prepayment penalty clause "similarly produces an absurd result—a penalty payment in an amount more than a third of the remaining $4 million loan principal, and dramatically more than the interest [InvestorsBank] would have received by reinvesting the funds."

¶ 43. In *BKCAP*, the court did find that a prepayment penalty provision was unenforceable because it created an absurd result, but the court did not find the provision absurd because it imposed a steep penalty. *See id.* at 359. In fact, the court found just the opposite, determining that by the plain terms of the contract the prepayment penalty would *always* be a negative amount or zero. In other words, the court found the plain meaning of the clause rendered the prepayment clause meaningless. *Id.* Here, the prepayment penalty clause is certainly not meaningless, imposing a $1.6 million fee on BV/B1 for prepayment.

¶ 44. We are similarly unpersuaded by BV/B1's argument that the circuit court's interpretation of the

483

clause is unenforceable because its result is "punitive." There is no law in Wisconsin that prohibits parties from contracting to whatever terms they please, provided they are not illegal. In exchange for agreeing to pay a high prepayment penalty, BV/B1 received terms it was unable to receive elsewhere: a 6.75% interest rate, an eighteen-month grace period, and no personal guarantees. In other words, BV/B1 received considerable compensation in exchange for exposing itself to a high prepayment penalty—a penalty it chose to inflict upon itself when it decided to sell the property after the eighteen-month grace period had lapsed. As a sophisticated party, if BV/B1 did not wish to pay the prepayment fee, it could have negotiated other terms. It didn't and now it is bound by the terms of the parties' agreement.

## II. Waiver

▮▮▮

¶ 45. Finally, BV/B1 argues that InvestorsBank waived its right to counterclaim for the remainder of the $1.6 million prepayment penalty fee because it accepted the reduced fee and released the collateral, and waited too long to enforce its right to the greater sum. We disagree.

¶ 46. BV/B1 is correct that "[a] party to a contract may waive strict and full performance of any provisions made for [its] benefit." See Wis JI—Civil 3058. "If performance under a contract is defective but a party consents to such performance with knowledge of the circumstances and, after full opportunity for examination, that party fails to give timely notice of the defect to the performing party, any requirement of strict performance is deemed to be waived." Id.

¶ 47. Here, however, InvestorsBank did not consent to defective performance. Instead, InvestorsBank offered to reduce the prepayment penalty in order to permit InvestorsBank to complete the sale to Graff/Goldman and to avoid litigation. In other words, InvestorsBank offered to change the terms of the parties' previous agreement—namely, remove the "plus 2.5%" variable—in exchange for BV/B1's potential future business and agreement that it would not pursue litigation. BV/B1 rejected that offer when it informed InvestorsBank that it sought immediate return of the reduced prepayment penalty fee and then commenced litigation. BV/B1 cannot now seek to enforce an offer that it previously rejected.

¶ 48. Moreover, we reject BV/B1's suggestion that "[a]ccord and satisfaction principles . . . provide an apt analogy." "An 'accord and satisfaction' is an agreement to discharge an existing disputed claim . . . [and] constitutes a defense to an action to enforce the claim." *Hoffman v. Ralston Purina Co.*, 86 Wis. 2d 445, 453, 273 N.W.2d 214 (1979). BV/B1 cites to *Hoffman* in support of its argument that InvestorsBank waived its claim under the prepayment penalty clause when it accepted the partial payment. However, this case is easily distinguishable from *Hoffman*.

¶ 49. In *Hoffman*, a horse breeder commenced an action against a horse-feed dealer, alleging claims for tort and breach of warranty, after the feed the dealer sold to the horse breeder killed several of his horses. *Id.* at 449. The circuit court dismissed the claims when it was revealed that, after the horses began to get ill, the horse breeder called the dealer, and following a series of meetings, the horse breeder signed a form releasing the dealer from "all liability as the result of the damage to

the horses." *Id.* at 449–50. In exchange for signing the release, the horse breeder received $3000. *Id.* The supreme court upheld the circuit court's dismissal of the case, holding that because the horse breeder "knew of . . . [the] offer of settlement [and] retained the check . . . [h]is tort claim . . . was thereby settled." *Id.* at 458.

¶ 50. Here, there was no such agreement. While InvestorsBank made BV/B1 an offer to avoid litigation, BV/B1 rejected that offer when it sent InvestorsBank a letter reserving its right to contest the enforceability of the prepayment penalty provision. It then followed through on that promise, that is, InvestorsBank never received any consideration in exchange for its offer, and therefore, there was no binding contract. Because BV/B1 never assented to InvestorsBank's offer, neither party was prohibited from seeking redress under the terms of the contract, and having previously notified BV/B1 of the amount owed under the contract, there were no time restrictions[5] on InvestorsBank's ability to file a claim for the total amount owed. Consequently, we affirm the circuit court.

*By the Court.*—Judgment affirmed.

[5] BV/B1 does not argue that InvestorsBank's claim falls outside the relevant statute of limitations.