IN RE the MARRIAGE OF: Glen DICKAU,
Petitioner-Appellant-Cross-Respondent,

v.

Georgianne DICKAU,
Respondent-Respondent-Cross-Appellant.

Court of Appeals

*No. 2011AP1516. Submitted on briefs May 8, 2012.*
*—Decided September 5, 2012.*

2012 WI App 111

(Also reported in 824 N.W.2d 142.)

On behalf of the petitioner-appellant-cross-respondent, the cause was submitted on the briefs of *Donald Roy Fraker* of *Fraker Law Firm, S.C.* of Mequon.

On behalf of the respondent-respondent-cross-appellant, the cause was submitted on the briefs of *Douglas W. Rose* and *Lora L. Chupita* of *Rose & DeJong, S.C.* of Milwaukee.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. KESSLER, J. At issue in this appeal is whether the circuit court erred in enforcing the parties' Marital Settlement Agreement ("the MSA"), eighteen years after their divorce, to require Glen Dickau ("Glen") to pay forty percent ("40%") of his disability benefit installments to his former wife, Georgianne Dickau ("Georgianne"). Specifically, the circuit court found that while the MSA required Glen to pay Georgianne 40% of his City of Milwaukee Employees Retirement System benefits ("ERS pension benefits") beginning in October 2001, when Glen reached the age of fifty-seven, Glen actively opted to receive continued disability benefits in lieu of ERS pension benefits. Thus, the circuit court determined that Georgianne was entitled to "40% of the disability payments which [Glen] has received, and should in the future receive, commencing with the first such payment received subsequent to his 57th birthday in October of 2001." The circuit court ordered interest on this arrearage at three percent ("3%"), compounded annually. As of April 1, 2011, this past due amount was calculated by the parties and stipulated to be $165,290.70. The circuit court ordered Glen to pay interest at the rate of twelve percent ("12%") per annum on any part of that sum not paid by May 14, 2011. Delinquent monthly payments occurring after April 25, 2011, were to bear interest at 3% per annum, compounded annually.

¶ 2. Glen appeals from the entire order, essentially arguing that: (1) because Glen received disability benefits, rather than ERS pension benefits, the circuit court erroneously ignored the terms of the MSA which address the pension benefits; (2) Georgianne waited too long to pursue enforcement of the divorce judgment; and (3) the

313

circuit court erroneously retroactively assessed interest on payments it determined to be past due. Georgianne cross-appeals the circuit court's interest assessment, arguing that the court should have awarded interest on the past due amounts at 12%, pursuant to WIS. STAT. § 815.05(8) (2009–10),[1] rather than at 3%. We affirm in part and reverse in part.

## BACKGROUND

¶ 3. Glen and Georgianne divorced in 1993, after twenty-four years of marriage. Glen was a City of Milwaukee firefighter who had been receiving disability allowance payments since 1985. At the time of their divorce, the parties anticipated that in October 2001, when Glen reached the age of fifty-seven, that the City would switch from providing Glen his "Duty Disability Allowance" to providing monthly ERS pension benefits. The divorce judgment included the MSA, which allocated Glen's ERS pension benefits between the parties. The MSA specified multiple alternatives for transferring the ERS pension funds to Georgianne, stating ultimately that if the alternatives failed, Glen was to make payments directly to Georgianne. The MSA, as relevant, stated:

> The husband's *interest in the Employees Retirement System* of the City of Milwaukee shall be divided by a Qualified Domestic Relations Order with 40% of such accrued benefit through the date of divorce, herein, being awarded to the wife.
>
> . . . .
>
> [T]he husband, commencing with his first monthly retirement benefit received by the Employees Retire-

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

ment System shall pay to the wife 40% of the retirement benefit accrued as of the date of divorce herein, which amount is 40% of $1,705.80 or $682.32 to the wife immediately after receiving such monthly benefit. The husband shall continue to pay the wife this amount upon his receipt of each succeeding monthly benefit.

(Emphasis added.) The anticipated retirement benefits were taxable to Glen. Consequently, the MSA required Georgianne to reimburse Glen for 40% of the taxes he paid on the payments he received.[2] In addition, Georgianne was to receive 40% of any ERS death benefit either directly from the ERS as a named beneficiary or to be paid to her by Glen's heirs.

¶ 4. Several years after the divorce, in 2001, Glen joined four other firefighters in the appeal of a circuit court decision refusing to expand their "Duty Disability Allowances"[3] beyond what was contractually in place at the time their employment commenced with the City. That appeal resulted in our decision in *Rehrauer v. City of Milwaukee*, 2001 WI App 151, 246 Wis. 2d 863, 631 N.W.2d 644. The firefighters involved in that litigation, Glen included, all began their employment with the City prior to February 8, 1972, and all received duty disability benefits at various times after September 1977. *Id.*, ¶ 2. The City granted the firefighters the limited-term duty disability benefits that were provided

[2] The Marriage Settlement Agreement provided: "If the portion of these pension benefits are paid to the wife by the husband directly, the wife shall indemnify the husband by April 15th of each year, in the amount of 40% of the state and federal income taxes paid by the husband as a result of such pension income received in the preceding year."

[3] The "Duty Disability Retirement Allowance" in the ERS is frequently referred to as "duty disability benefits" by the circuit court. We do the same.

under their contracts in place at the time of their hiring, but denied them the lifetime duty disability benefits that had been established by a subsequent contract in effect from February 8, 1972, to September 30, 1977. *Id.* Essentially, the appellant firefighters were hired before, but disabled after, the lifetime benefits became a part of the City contracts. We concluded "that the firefighters gained vested rights in *the highest level of duty disability benefits* that came to be *contractually established during their years of active duty.*" *Id.*, ¶ 20 (emphasis added). As relevant to this appeal, the effect of our holding allowed Glen to receive lifetime duty disability benefits, rather than receive ERS pension payments.

¶ 5. It is undisputed that this post-divorce litigation occurred without Georgianne's knowledge. In November 2009, Georgianne brought a motion to enforce the divorce judgment, arguing that she was entitled to 40% of Glen's ERS payments, dating back to November 2001. Glen argued that as a result of *Rehrauer*, he did not receive ERS pension payments, thus, Georgianne was not entitled to any benefits.

¶ 6. After an Assistant Family Court Commissioner resolved the matter in favor of Georgianne, granting her 40% of Glen's current disability benefits and arrears from November 2001, Glen filed a motion for a *de novo* hearing. Glen argued that Georgianne was not timely in bringing her motion to enforce the divorce judgment.

¶ 7. After hearing testimony from both Glen and Georgianne, as well as other witnesses, the circuit court issued an oral decision, finding that Glen intentionally withheld information pertaining to the effects of the *Rehrauer* litigation and intentionally attempted to conceal the fact that he would now receive lifetime disabil-

316

ity payments. The circuit court dismissed Glen's argument that Georgianne's claims were untimely, stating that Georgianne attempted to enforce the divorce judgment as soon as she learned of Glen's intent not to pay her. The circuit court also awarded 3% interest on the amount determined to be past due from October 2001 through May 2011. The circuit court issued a written order, consistent with its findings at the hearing, establishing as follows:

(1) The Petitioner shall pay the Respondent forty percent (40%) of the disability payments which he has received, and should in the future receive, commencing with the first such payment received subsequent to his 57th birthday in October of 2001 and continuing from that date forward indefinitely;

(2) except as noted in part (4) below, any delinquency in said payments shall bear interest at the rate of three percent (3%) per annum, compounded annually;

(3) the Petitioner shall pay Respondent the past due amount as agreed upon by the parties, $165,290.70, by May 14, 2011; and,

(4) should Petitioner fail to pay the past due amount by May 14, 2011, then the remaining arrearage shall bear interest from that point forward at the statutory rate of twelve percent (12%) per annum.

Glen appeals the circuit court's finding that Georgianne's pursuit of her claims was not untimely, as well as the order in its entirety. Georgianne cross-appeals the circuit court's award of interest on the past due payment at 3%, arguing that she was statutorily entitled to an award of 12% interest.

317

## DISCUSSION

¶ 8. On appeal, Glen argues that: (1) the circuit court erroneously found that Georgianne did not wait too long to enforce the divorce judgment; (2) he does not owe Georgianne anything pursuant to the divorce judgment because he does not receive ERS pension benefits; (3) a conclusion by us holding otherwise would be an improper modification of property division under WIS. STAT. § 767.59(1c)(b) or WIS. STAT. § 806.07; (4) if he owes anything, it is not 40% of his monthly disability benefits, but rather $682.32 per month, as stated in the divorce judgment; and (5) the circuit court improperly retroactively assessed interest, compounded at 3% annually, on the amount it found was due between October 2001 and April 1, 2011. Georgianne contends that she was entitled to interest calculated at 12% annually on the past due amount. We disagree with both parties.

### I. Delay by Georgianne.

¶ 9. A party who delays in making a claim may lose his or her right to assert that claim based on the equitable doctrine of laches. *Zizzo v. Lakeside Steel & Mfg. Co.*, 2008 WI App 69, ¶ 7, 312 Wis. 2d 463, 752 N.W.2d 889. The elements of laches are: "(1) unreasonable delay by the party seeking relief, (2) lack of knowledge or acquiescence by the party asserting laches that a claim for relief was forthcoming, and (3) prejudice to the party asserting laches caused by the delay." *Id.* The reasonableness of the delay, and whether prejudice resulted from the delay, are questions of law based upon factual findings. *State ex rel. Coleman v. McCaughtry*, 2006 WI 49, ¶ 17, 290 Wis. 2d 352, 714 N.W.2d 900. Once the elements of laches have been established, a court still has discretion whether or not to apply the doctrine. *Id.*

¶ 10.  The circuit court found that based on the MSA, Glen was "well aware that his wife had an interest in his pension," but never informed her that pursuant to this court's 2001 decision in *Rehrauer*, when he reached age fifty-seven, he began receiving higher, tax-free payments than the parties originally contemplated. The circuit court also found that Glen intentionally concealed his receipt of disability payments, stating:  "It is . . . entirely clear that [Glen] later endeavored to conceal from [Georgianne] that he would be on disability for the rest of his life, that he would never receive [ERS] pension [payments], and that in his view this change obviated any interest she had in his pension." In rendering this finding, the circuit court specifically pointed to Glen's testimony regarding why he did not want Georgianne to find out about his lifetime disability benefits:

> I wanted it to be a surprise like when she went for my 40 percent and when I asked her about it, her answer to me was, [b]ecause I'm entitled to it. Well, I was entitled to sex at home. I was entitled to a clean house. I didn't get either, but she was entitled to my pension. That just irked me . . . .

¶ 11.  The circuit court also pointed to the testimony of Susan Byrd, a family friend, who testified that in or around 2009, Glen told her about his "phenomenal break" and was amused that, in his view, Georgianne would never have access to his disability benefits. Byrd reported Glen's statements to Georgianne. The circuit court found that "[t]his behavior on Mr. Dickau's part effectively precludes this court from seriously considering" his argument that "Ms. Dickau's effort to obtain relief is untimely," because "[o]nce Ms. Dickau heard from [a friend] that [Glen] would never pay her so much as a single penny, she acted with reasonable diligence to obtain relief."

319

¶ 12. The circuit court findings demonstrate that between 2001 and 2009 Glen intentionally failed to inform Georgianne of material facts related to their divorce judgment. Our decision in *Rehrauer* was released June 26, 2001. Glen reached age fifty-seven in October 2001. Glen knew *before* he was fifty-seven that he would be receiving much more valuable benefits than the parties anticipated at the time of the divorce. Further, his change in benefits was a direct result of action he took and choices he made. Glen knew the divorce judgment gave Georgianne a right to 40% of his ERS pension benefits, and that Georgianne never affirmatively relinquished or disavowed her claim. The lifetime disability benefits he received were part of his "interest in the Employees Retirement System." Glen has not been prejudiced by the delay because he had no reason to believe Georgianne would not assert her claim; indeed, his effort to keep her in the dark about his improved circumstances permit only the inference that he knew she had rights in those benefits. We conclude, as did the circuit court, that as a matter of law, Georgianne's delay in bringing the action to enforce the divorce judgment was reasonable in the context of Glen's lengthy and intentional failure to tell Georgianne of the significant change he had caused in his financial circumstances.

## II.  *The Divorce Judgment.*

### A.  **The Language of the MSA.**

¶ 13.  The award of future pension benefits in a divorce judgment is a division of property which vests "at the moment the [divorce] decree is entered," and there-

after the spouse retains only the remainder interest in the pension. *Dewey v. Dewey*, 188 Wis. 2d 271, 275–76, 525 N.W.2d 85 (Ct. App. 1994). Thus, Georgianne's 40% interest in Glen's post-age fifty seven monthly ERS pension benefits vested in June 1993. Under *Dewey*, Glen had no right to later dispose of her interest without her specific consent. *See id.* at 276–78. "While the final division of property in a divorce judgment is indeed final, the jurisdiction of the court 'continue[s] until the property [is] disposed of pursuant to the provisions of the division contained in the judgment of divorce.' " *Washington v. Washington*, 2000 WI 47, ¶ 14, 234 Wis. 2d 689, 611 N.W.2d 261 (citation omitted; brackets in *Washington*). Circuit courts have "the authority to do all things 'necessary and proper' in actions affecting the family 'to carry [the courts'] orders and judgments into execution.' " *Id.* (citation omitted; brackets in *Washington*).

¶ 14.  "In reviewing legal issues, such as construction of a divorce judgment, appellate courts apply a *de novo* standard of review . . . . We construe divorce judgments at the time of their entry and in the same manner as other written instruments." *Waters v. Waters*, 2007 WI App 40, ¶ 6, 300 Wis. 2d 224, 730 N.W.2d 655 (internal citations omitted). "We apply the rules of contract construction to a divorce judgment . . . . This is true even when the divorce judgment is based on the parties' stipulation . . . . In divorce actions, stipulations are in the nature of a contract." *Id.* (internal citations omitted). "Terms used in contracts are to be given their plain or ordinary meaning." *Id.*

¶ 15.  Construction of a judgment is appropriate "if a divorce judgment is ambiguous." *Washington*, 234 Wis. 2d 689, ¶ 17. "Divorce judgments are to be con-

strued as of the time of entry and in the same manner as other written instruments. The court will consider the whole record in construing a divorce judgment." *Id.* (footnotes omitted). "Ambiguity exists when the language of the written instrument is subject to two or more meanings, either on its face or as applied to the extrinsic facts to which it refers. Determining whether [a judgment of divorce is ambiguous] is a question of law." *Id.*, ¶ 18 (footnotes omitted).

¶ 16. As material to the issues in this appeal, the MSA stated the following with regard to ERS pension benefits:

### III.  C.  DIVISION OF RETIREMENT BENEFITS

The husband's interest in deferred compensation 457 plan with the City of Milwaukee shall be divided equally between the parties and the husband shall cooperate in making arrangements as necessary to transfer one-half of the balance of such account as of the date of divorce herein to an IRA rollover account set up by the wife.

The husband's interest in the Employees Retirement System of the City of Milwaukee shall be divided by a Qualified Domestic Relations Order with 40% of such accrued benefit through the date of divorce, herein, being awarded to the wife. A copy of the Qualified Domestic Relations Order is attached hereto and incorporated by reference herein.[4]

---

[4] There was no Qualified Domestic Relations Order attached to the MSA. Nor is it likely there would have been at the time of the Dickau divorce in 1993 because six years earlier we held in *Lindsey v. Lindsey*, 140 Wis. 2d 684, 686, 412 N.W.2d 132 (Ct. App. 1987), also involving a City of Milwaukee fireman's pension, that State statutes prohibited the direct alienation of any part of city-provided pension benefits by court order, but we

If, for any reason, the Employees Retirement System from the City of Milwaukee refuses to accept a Qualified Domestic Relations Order from this court, the parties agree to attempt to furnish the Employees Retirement System with a Domestic Relations Order which shall encompass the same division of such retirement benefits as contained in the Qualified Domestic Relations Order attached hereto. If, for any reason, the Employees Retirement System also refuses to accept any Domestic Relations Order, each party shall retain the right to implead the Employees Retirement System of the City of Milwaukee in this action and seek an order from this court that the Employees Retirement System accept and obey either a Qualified Domestic Relations Order or a Domestic Relations Order as provided herein.

[T]he husband, commencing with his first monthly retirement benefit received by the Employees Retirement System shall pay to the wife 40% of the retirement benefit accrued as of the date of divorce herein, which amount is 40% of $1,705.80 or $682.32 to the wife immediately after receiving such monthly benefit. The husband shall continue to pay the wife this amount upon his receipt of each succeeding monthly benefit.

[T]he wife shall indemnify the husband by April 15th of each year, in the amount or 40% of the state and federal income taxes paid by the husband as a result of such pension income received in the preceding year.

[T]o the extent that it is permitted by said Employees Retirement System of the City of Milwaukee, the husband shall name the wife as his surviving spouse or beneficiary to the extent that she shall receive 40% of any such benefits, if they be paid. Also, if the Employees Retirement System of the City of Milwaukee refuses to allow the wife to be so named as a surviving

recognized the court's authority to order a party to take particular actions with respect to those benefits.

spouse as provided herein, the husband agrees that his estate, heirs or assigns shall pay 40% of any such death benefit that is paid into said estate or to said heirs or assigns to the wife immediately upon their receipt of such death benefit.

. . . .

VIII. VOLUNTARY EXECUTION/NATURE OF AGREEMENT

. . . All of the agreement's terms are intertwined and interconnected and shall not be severed or modified. It is agreed that the terms and provisions are interdependent.

(Some formatting altered.)

¶ 17. Glen argues essentially that the MSA requires only that he pay Georgianne a portion of age-driven benefits, which he calls retirement or pension benefits. Because, in his view, he receives no such benefits, he concludes that he owes Georgianne nothing. Georgianne argues essentially that the judgment gives her 40% of all monthly "Employee Retirement System" benefits which Glen receives after he is age fifty-seven. The MSA orders Glen to pay "40% of $1,705.80 or $682.32 to the wife immediately after receipt of such monthly benefit" from his retirement benefits. The parties' reference to Georgianne's monthly share both as a fixed dollar amount and as a percentage of Glen's monthly benefit is not explained. This creates an ambiguity on the face of the MSA. Glen's argument that "pension" in the MSA means something less than the requirement that his interest in the ERS shall be divided with 40% of such accrued benefit through the date of the divorce and awarded to Georgianne, creates another ambiguity both on the face of the MSA and as applied.

¶ 18. The parties agreed in the MSA that "[a]ll of the . . . terms are intertwined and interconnected . . . . [and] that the terms and provisions are interdependent." Thus to resolve the ambiguities in the judgment, we must consider the document as a whole and the surrounding circumstances in which it was created. *See Schultz v. Schultz*, 194 Wis. 2d 799, 805, 535 N.W.2d 116 (Ct. App. 1995). We do not focus exclusively on isolated words or phrases. *See Cashin v. Cashin*, 2004 WI App 92, ¶ 11, 273 Wis. 2d 754, 681 N.W.2d 255.

¶ 19. The MSA section heading under which all of the disputed language appears is "Division of *Retirement* Benefits." (Emphasis added.) Included in this section are a variety of benefits awarded to Georgianne that include more than age-related monthly payments. We equate those payments with the benefits both parties expected Glen to begin receiving at age fifty-seven. Included in the "husband's interest in the Employees Retirement System of the City of Milwaukee" are a "deferred compensation 457 plan with the City," (of which Georgianne immediately received fifty percent), and 40% of death benefits to which a surviving-spouse would be entitled. Georgianne was required to reimburse Glen for 40% of any state or federal taxes he paid on the monthly benefit. She was awarded 40% of any benefits payable to a surviving spouse, including the right to collect such benefits from Glen's heirs or beneficiaries. The percentage applied in the MSA to benefits that could not be transferred until some point in the future is uniformly 40%. By contrast, Georgianne received fifty percent of the one ERS benefit which could be legally transferred immediately—the deferred compensation account. The face of the judgment supports the conclusion that the parties intended Georgianne would receive 40% of all *future* ERS benefits received by Glen or his beneficiary or designee.

¶ 20. Because we must clarify this ambiguous judgment, we also look to evidence of the parties' intent at the time of the divorce. We may " 'clarify,' " but not " 'revise' " or " 'modify' " the judgment. *See Washington*, 234 Wis. 2d 689, ¶ 19. " '[C]larify' . . . means to make clear or intelligible, to free from ambiguity." *See id.* Deference should be accorded the circuit court in resolving ambiguity in a divorce judgment where "there was a reasoned rationale to support [the circuit court's] conclusion that [it] was clarifying, not modifying, [its] original decision." *Schultz*, 194 Wis. 2d at 809.

¶ 21. There is no transcript of the 1993 divorce proceedings in the record before us; however, both parties testified extensively at the hearing on the motion to enforce the judgment. Georgianne testified that she understood she was receiving a percentage of the pension, and that if Glen's payments went up or down, she would share in the change. Specifically, in response to questions, Georgianne testified:

> [Question]: [D]id you reach an understanding regarding the pension as to how much you might receive sometime in the future?
>
> [Georgianne]: Yes . . . I asked for 40 percent. He was offering 30. The judge said I was entitled to 50. I said I was happy with 40.
>
> . . . .
>
> [Question]: Did you have an understanding whether or not by agreeing to a percentage that the dollar amount you might actually receive sometime into the future could go up or down?

[Georgianne]: Well, I guess I was pretty much depending on how much the city was paying pension ... I guess the answer would be yes.

¶ 22. Glen also testified that at the time of the divorce he understood that if the monthly payments he received from the ERS pension fluctuated, Georgianne's monthly payments would also fluctuate:

[Question]: [D]id you understand at the time you entered into that Marital Settlement Agreement that it was possible that your pension could go up in value so, therefore, the 40 percent you would be paying to your ex-wife would then be a larger amount of money?

[Glen]: Well ... I don't know about percent wise; but *if I would have gotten a raise or cost of living, ... she would have received 40 percent of what my retirement was.*

[Question]: If for some reason your pension would have gone down ... her 40 percent payment would logically then be much less, too; correct.

[Glen]: ... *[I]f I had to take a loss, I would expect her to take a loss.*

(Emphasis added.) The record abundantly supports the circuit court's conclusion that the parties described the ERS pension benefits Glen would receive when he reached age fifty-seven as "retirement benefits" and that they intended that Georgianne would receive 40% of the ERS pension benefits Glen received at and after that age.

¶ 23. With deference to the circuit court's conclusion that the parties understood and intended that the award to Georgianne of 40% of Glen's "retirement" benefits could fluctuate as to the amount Glen actually received, we clarify the ambiguity in the judgment to reflect their understanding.

¶ 24. As stated, at the time of the divorce, Glen was receiving duty disability payments, rather than ERS pension benefits. At the enforcement hearing, the circuit court found that at the time of the divorce Glen expected to receive retirement benefits at age fifty-seven in the amount of $1705.80 per month for life. This amount was based on his then-bi-weekly salary of $1400.03, or $36,400 per year. The retirement benefit included escalators of fifty dollars per month on the fourth, seventh and tenth anniversaries of service retirement. Glen explained at the enforcement hearing that he was receiving an untaxed amount of $3965.47 monthly in lifetime disability benefits. This, he explained, meant he was "receiving as much money in my pocket now as if . . . I was on the job" and agreed that he was doing "a lot better than [he] ever expected at the time of the divorce." When asked whether he "made the choice that [he] wanted the duty disability instead of the pension," Glen responded in the affirmative. By joining in the winning appeal, Glen transformed his taxable ERS pension payments into a tax-free lifetime "Duty Disability Retirement Allowance."

¶ 25. Glen argues that these disability benefits are fundamentally different from retirement benefits. Relying primarily on *Topolski v. Topolski*, 2011 WI 59, 335 Wis. 2d 327, 802 N.W.2d 482, Glen argues that the circuit court was precluded from awarding *any portion* of Glen's disability payments to Georgianne. Thus, Glen reasons, the circuit court committed an error of law when it equated the disability benefits Glen actually received with the retirement benefits he expected to receive after age fifty-seven at the time of the divorce. Glen ignores our supreme court's actual holding that "the husband's disability pension under the Pension Plan when he reaches [a certain age] constitutes a

retirement, pension or deferred benefit account under the Marital Settlement Agreement." *See id.*, ¶ 6.

¶ 26.   We conclude that the decision in *Topolski* is entirely supportive of and consistent with the circuit court's conclusions here. In *Topolski*, the divorce judgment required " '[a]ll retirement, pension, and deferred benefit accounts in [the husband's] name, less the sum of $912.88 to be paid by [the husband] to [the wife] per month, if and when received by him.' " *Id.*, ¶ 3 (citing the pension plan at issue in *Topolski*; second, third and fourth set of brackets in *Topolski*). The Marital Settlement Agreement and judgment did not separately mention disability benefits. *Id.*, ¶ 6. After the divorce judgment, in 2001 when he was fifty-three years old, the husband begin receiving disability payments under the pension plan. *Id.*, ¶ 3. In a contempt proceeding brought by the former wife, who had received no portion of those benefits, the circuit court awarded the wife $912.88 per month, plus interest, from the time the former husband began receiving the disability benefits, apparently until the finding of contempt. *Id.*, ¶ 1. We reduced the award to begin when the former husband reached age sixty-five, which was the "normal" retirement age under the plan. *Id.*, ¶ 2. This was also the age when the parties had contemplated the husband would retire had he not been injured. *Id.* The supreme court concluded that because the amount that the husband received as a disability pension pursuant to the Pension Plan was the amount he would receive as a normal pension, that is, the amount he would receive when he retired at the age of sixty-five, the disability payments under the plan were a substitute for the retirement pension *when the employee reached retirement age. Id.*, ¶¶ 70–72. However, the supreme court awarded the wife benefits beginning when the husband

was sixty-two because the amount available in disability at age sixty-two was exactly the same as retirement at age sixty-five. *Id.*, ¶ 74. The supreme court concluded that pursuant to the Marital Settlement Agreement this result effectively placed "the husband and wife in the same position they would have been in had the husband not become disabled. This holding gives both the husband and wife exactly what they bargained for in the Marital Settlement Agreement." *Id.*, ¶¶ 72–73.

¶ 27. The similarities between *Topolski* and this case are striking. Here, as in *Topolski*, the parties intended a specific retirement age. Here, as in *Topolski*, an unexpected event at the time of divorce changed the choices available to the husband. In *Topolski*, the husband became disabled; here, Glen involved himself in litigation which made lifetime disability benefits available to him at age fifty-seven. In *Topolski*, the husband got exactly the same benefits on disability that he would have received in retirement; here, the benefits Glen now receives are significantly more valuable than the retirement payments he expected.[5] Here, as in *Topolski*, the disability benefit payments are in fact and in law a substitute or age-related retirement benefits to which the employee had earlier been entitled. As such, an award to Georgianne of 40% of the payments Glen began receiving at age fifty-seven "gives both the hus-

[5] We note that neither of the parties in *Topolski v. Topolski*, 2011 WI 59, 335 Wis. 2d 327, 802 N.W.2d 482, argued that their marriage settlement agreement was ambiguous; therefore, the circuit court relied only on the contract itself. Unlike the court in *Topolski*, we rely, in part, on the testimony of the parties because of the ambiguities in the MSA. *See Roth v. City of Glendale*, 2000 WI 100, ¶ 49, 237 Wis. 2d 173, 614 N.W.2d 467 (If a contract is ambiguous, we may look to extrinsic evidence to determine the parties' intent.).

band and wife exactly what they bargained for in the Marital Settlement Agreement." *See id.*, ¶¶ 72–73.

¶ 28. Also consistent with *Topolski* is our decision in *Loveland v. Loveland*, 147 Wis. 2d 605, 433 N.W.2d 625 (Ct. App. 1988), where we considered the rights of a former spouse to enforce a divorce judgment awarding her "an amount equal to one-fourth of [the husband's] military pension accrual." *Id.*, at 607. Post-divorce, the husband retired from the military and elected to receive part of his pension payments as disability payments, as permitted by 38 U.S.C. § 3105. *Id.* The only difference between the pension benefits and the disability benefits was that the husband waived the taxable pension benefits equal in amount to the nontaxable disability benefits. *Id.* at 611. We concluded that, "[f]or purposes of property division under the divorce laws of this state, these are differences of no consequence. Had [the husband] not waived part of his retirement pension, that pension would have equaled the total he now receives in pension and disability benefits." *Id.* We concluded that his unilateral ability to change the benefits from one form to another form "should not, . . . and [did] not, deprive [the former wife] of her right under the judgment to that part of his pension received in the form of disability benefits." *Id.* Here, Glen's unilateral action, which increased his benefits substantially, should not deprive Georgianne of her rights under the MSA.

## B. Modification of the Judgment.

¶ 29. Glen also attempts to reframe Georgianne's motion to enforce the divorce judgment as a motion for modification under Wis. Stat. § 806.07. Consequently, Glen contends that the circuit court erroneously granted the modification under Wis. Stat. § 767.59(1c)(b) by modifying the property division.

331

¶ 30. Glen bases his argument on *Winkler v. Winkler*, 2005 WI App 100, 282 Wis. 2d 746, 699 N.W.2d 652, where a former wife moved to reopen her divorce judgment for an award of a portion of her former husband's "backdrop" pension benefits from Milwaukee County. *See id.*, ¶ 1. We affirmed the circuit court's denial of the motion under WIS. STAT. § 806.07. *Winkler*, 282 Wis. 2d 746, ¶¶ 1, 16–20. In *Winkler*, the record clearly established that the wife had gotten the fixed monthly benefits she specifically requested on the record at the divorce, and at that time she specifically rejected a percentage share of the husband's pension. *Id.*, ¶¶ 19, 21. Although we commented that "[t]he backdrop benefit provisions were an unanticipated windfall," that was not a fact critical to our decision. *Id.*, ¶ 20. Glen's apparent reliance on that statement is misleading as to our holding. The former husband in *Winkler* did nothing to create the backdrop benefit. *Id.* Here, Glen engaged in appellate litigation to pursue the enhanced benefits he ultimately received. He gave up the pension in which Georgianne, without agreement by her, had a vested interest as of the day of the divorce. *See Dewey*, 188 Wis. 2d at 275–76. Georgianne did not seek to reopen the judgment under § 806.07. She sought to enforce the existing judgment.

### III. Interest on the Award.

¶ 31. Both Glen and Georgianne appeal the circuit court's determination regarding the retroactive application of a 3% interest rate to the amount the circuit court determined Glen owed from October 2001 through April 1, 2011. Glen contends that because he was unaware that he owed Georgianne 40% of his disability benefits dating back to October 2001, the circuit court errone-

ously retroactively assessed interest against him. Georgianne, by contrast, contends that the circuit court should have assessed interest at 12%, pursuant to Wis. Stat. § 815.05(8). We disagree with both parties.

¶ 32. Wisconsin Stat. § 815.05(8), at the time the judgment was rendered, provided that "every execution upon a judgment for the recovery of money shall direct the collection of interest at the rate of 12% per year on the amount recovered from the date of the entry of judgment until it is paid." On March 15, 2011, the circuit court ordered that Glen pay Georgianne "40% of his disability pay beginning from the day he turned 57." As the circuit court observed, Georgianne "quite generously agreed to forgo the usual rate of 12 percent" and that "[n]o one has suggested an alternative interest rate." The circuit court explained "I am well aware that interest rates have been well under 12 percent for the last decade, which is primarily the decade in question and, in addition, that investments in the stock market have suffered in recent years," which led the circuit court to set a rate of 3% compounded annually on Glen's arrears. There was no objection by any party. We conclude, therefore, that both Glen and Georgianne have forfeited any objection to the interest rate applied to the October 2001 to April 2011 delinquency. *See Borntreger v. Smith,* 2012 WI App 35, ¶ 16, 340 Wis. 2d 474, 811 N.W.2d 447.

¶ 33. The circuit court properly applied the 12% then required by statute to the arrearage amount recited in the April 25, 2011 judgment, if the arrearage amount was not paid before the grace period allowed in the order. No objection to that portion of the order appears in the transcript, and we conclude the parties' forfeited objection to that interest rate.

¶ 34.   Georgianne also appeals the circuit court's prospective award of 3% interest on future delinquent payments. She argues that she is entitled to the 12% statutory interest rate in effect when the circuit court issued this order.

¶ 35.   First, we note that Georgianne did not object to the 3% rate at the time the circuit court set that rate. More importantly, the statute allowing interest on judgments, WIS. STAT. § 815.05(8), changed dramatically, effective December 2, 2011.[6] Section 815.05(8)[7] now requires annual interest at the prime rate plus one percent. *See id.* The prime rate is determined in a manner described in the statute first on January 1, and again on July 1, and then applied based on the time the judgment is entered. *See id.* Although a fixed prospective interest rate on delinquent payments has much to recommend it in the context of certainty to litigants and economical use of judicial time, the legislature has set a different policy. The statute does not appear to permit the circuit court to prospectively set a fixed rate interest on future delinquencies other than as directed by the statute.

---

[6] *See* 2011 WIS. ACT 69, § 3.

[7] WISCONSIN STAT. § 815.05(8) (effective December 2, 2011) now provides, in relevant part:

> Except as provided in s. 807.01 (4), every execution upon a judgment for the recovery of money shall direct the collection of interest at *an annual rate equal to 1 percent plus the prime rate* in effect on January 1 of the year in which the judgment is entered if the judgment is entered on or before June 30 of that year or in effect on July 1 of the year in which the judgment is entered if the judgment is entered after June 30 of that year, as reported by the federal reserve board in federal reserve statistical release H. 15, on the amount recovered from the date of the entry of the judgment until it is paid.

(Emphasis added.)

¶ 36. We affirm the order applying the statutory interest rate of 12% to the 2001 to 2011 arrearage, if the arrearage was not paid by the date set in the judgment. Because the legislature has significantly changed the method of determining the amount of post-judgment interest which is to be awarded in the future, we reverse that part of the order as to any delinquent monthly payments which occur after December 2, 2011, and remand for such actions or proceedings as may be necessary.

## CONCLUSION

¶ 37. For the foregoing reasons, we affirm in part, and reverse and remand in part.

*By the Court.*—Order affirmed in part, reversed in part and cause remanded for further proceedings.