**COURT OF APPEALS
DECISION
DATED AND FILED**

**October 27, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP1352**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2019CV3483**

**IN COURT OF APPEALS
DISTRICT IV**

WISCONSIN BANK & TRUST,

   PLAINTIFF-APPELLANT,

 V.

JIM HERMAN, INC., PAULA J. HERMAN AND WILKES, LLC,

   DEFENDANTS,

JAMES (JIM) HERMAN FAMILY PARTNERSHIP,
DUSTIN WILKE, DEBRA TOOLEY, DANNY L. HERMAN,
LARRY H. STARK AND DARREN W. HERMAN,

   DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Dane County: MARIO WHITE, Judge.  *Reversed and cause remanded*.

Before Blanchard, P.J., Fitzpatrick, and Nashold, JJ.

¶1     FITZPATRICK, J.  Wisconsin Bank & Trust ("the Bank") appeals an order of the Dane County Circuit Court granting summary judgment to the James (Jim) Herman Family Partnership ("the Partnership") and denying the Bank's motion for summary judgment.  At issue in this appeal are guaranties and mortgages (the "Guaranties and Mortgages") that were executed on behalf of the Partnership by Marjorie Herman—one of the partners.  The purpose of the Guaranties and Mortgages was to secure loans from the Bank to a farming corporation which was operated by at least one partner of the Partnership and rented land from the Partnership.  After a default on one of the loans, the Bank commenced an action in the circuit court against the Partnership to enforce the Guaranties and Mortgages.  In response, the Partnership stated a counterclaim asserting that the Guaranties and Mortgages are not enforceable because Marjorie lacked the authority to execute those documents on behalf of the Partnership.

¶2     Both parties moved for summary judgment.  The Bank argued that the Partnership's counterclaim is barred by the doctrine of laches.  The Bank also argued that, even if laches does not apply to bar the counterclaim, the Guaranties and Mortgages are valid and enforceable because Marjorie had actual and apparent authority to execute the agreements on behalf of the Partnership.  The Partnership argued in its motion that laches does not bar its counterclaim and also that Marjorie lacked authority to execute the Guaranties and Mortgages.  The circuit court agreed with the Partnership, ruling that the Partnership's counterclaim is not barred by laches and that the Guaranties and Mortgages are void and unenforceable.

¶3     On appeal, the Bank renews its arguments made in the circuit court and contends that the circuit court erred in entering summary judgment for the Partnership and denying the Bank's motion for summary judgment.  We conclude

that neither party's motion for summary judgment should be granted because there are genuine issues of material fact, and reasonable competing inferences from the facts, concerning the application of the doctrine of laches and whether Marjorie had actual or apparent authority to execute the Guaranties and Mortgages on behalf of the Partnership. Accordingly, we reverse the circuit court's order and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶4    In 1982, James and Marjorie Herman executed a "Partnership Agreement" establishing the Partnership with them as the partners.[1] The next year, James and Marjorie added their four children as partners: Renee Laufenberg, Gail Leslie, and Penny Sutkay (collectively, "the Sisters"), and Edwin Herman. James generally had sole responsibility for managing the affairs of the Partnership, including the Partnership's purchase and sale of land. The business of the Partnership was in part the rental of land to the family business, Jim Herman, Inc. ("JHI"), and JHI was operated at the time by James.

¶5    James died in 1996, and his partnership interest passed to the Jim Herman Marital Trust (the "Marital Trust"), which became a partner in the Partnership. Later, the Jim Herman Family Trust (the "Family Trust") was added as a partner in the Partnership. Marjorie was, at all times until her death, the sole trustee of both the Marital Trust and the Family Trust. After James died, Marjorie managed the Partnership business and continued to purchase and sell real estate on behalf of the Partnership. Edwin assisted Marjorie in managing the Partnership,

---

[1] Pertinent terms of the Partnership Agreement and other agreements will be discussed later in this opinion.

but the Sisters were generally not involved with the operation of the Partnership. In 2001, the Sisters and Edwin executed a Power of Attorney ("POA") authorizing Marjorie to act as the agent for the Sisters and Edwin "in any lawful way with respect to all real property transactions of [the Partnership]."

¶6      Between 2007 and 2010, Marjorie executed a series of four Guaranties and five Mortgages on behalf of the Partnership. These contracts guaranteed a loan to JHI—which was by then operated by Edwin—and secured payment of that debt by placing liens on substantially all of the Partnership's real estate holdings. As proof of her authority to execute the Guaranties and Mortgages, Marjorie provided to Ronald Markham (a senior vice president of the Bank) the Partnership Agreement, a list of the current partners, the POA, and a document requested by the Bank entitled Partnership Authorization ("Authorization"). The Sisters were not aware of the Guaranties, Mortgages, or Authorization at the time any of those documents were executed by Marjorie.

¶7      In 2013, the Sisters asked an attorney to investigate the use of Partnership property as collateral for the Bank's loans to JHI.[2] The attorney sent a letter to the Bank requesting, among other things, copies of any mortgages in favor of the Bank secured by the Partnership's property. Markham provided copies of the Mortgages as requested.

¶8      In June 2017, four years after receiving the copies of the Mortgages, the Sisters met with Markham to discuss the Mortgages. At this meeting Markham informed the Sisters that his understanding was that the POA authorized

_____

[2] Further details of communications among the Sisters, their attorneys, and the Bank from 2013 to 2018 will be discussed later in this opinion.

Marjorie to act on the Sisters' behalf. The Sisters have testified in this action that, after June 2017, they waited to further discuss issues regarding the Mortgages with Markham because they were busy with their personal lives and did not think at the time that it was appropriate to question Marjorie and Edwin's management of the Partnership.

¶9 Edwin died shortly after the Sisters' meeting with Markham in June 2017, and one of the Sisters asked Markham whether the proceeds of Edwin's life insurance policy would cover the Partnership's obligations to the Bank. Markham did not respond, and the Sisters sought advice from another attorney. Over several months, the new attorney communicated with Markham on the following topics: the Guaranties, the Mortgages, and whether the proceeds of Edwin's life insurance policy would cover the Partnership's obligations to the Bank.

¶10 In July 2018, Marjorie died. Two days after Marjorie's death, the Sisters' attorney sent a letter to Markham stating that the Bank had received Edwin's life insurance proceeds and demanding that the Bank release the Partnership's Mortgages. That letter stated that "[a] genuine legal question exists as to whether [Marjorie] had the legal authority to sign these mortgages." The Bank contends that this is the earliest date on which the Bank could be deemed to have received notice from the Sisters that the validity of the Guaranties and Mortgage was in dispute.

¶11 The Bank did not release the Guaranties or Mortgages. In 2019, JHI defaulted on one of its loans, and the Bank filed a lawsuit in the circuit court

5

against the Partnership to enforce the Guaranties and Mortgages. The Partnership[3] filed an answer to the Bank's complaint and asserted, among other things, a counterclaim that the Guaranties and Mortgages are void and unenforceable because, according to the Partnership, Marjorie lacked the authority to execute those documents on behalf of the Partnership.[4]

¶12 The Bank and the Partnership both moved for summary judgment. The Bank contended that the Partnership's counterclaim was barred by laches. The Bank also argued that it was entitled as a matter of law to the entry of a money judgment and a foreclosure judgment against the Partnership because the Guaranties and Mortgages are valid and enforceable. The Partnership argued that the circuit court should dismiss the Bank's claims against the Partnership and release the Partnership from its obligations because the Guaranties and Mortgages are void and unenforceable.

---

[3] At the time the Partnership answered the Bank's complaint, the following persons and entities were partners: Renee Laufenberg, Gail Leslie, Penny Sutkay (the Sisters), the Marital Trust, the Family Trust, and the Estate of Edwin Herman. Sutkay was the trustee of both trusts, and the Estate of Edwin Herman did not have a voting interest in the Partnership. Thus, the Sisters at that point had full control of the Partnership.

[4] The Bank's amended complaint also named as defendants: JHI; Paula J. Herman; the Edwin and Paula Herman Trust; Wilkes, LLC; Dustin Wilke; Debra Tooley; Danny L. Herman; Larry H. Stark; and Darren W. Herman. The Partnership's amended answer also raised cross claims against JHI and Paula J. Herman. The claims and cross claims asserted against these parties are not pertinent to this appeal, and we do not discuss those further.

¶13   The circuit court issued a written order denying the Bank's motion for summary judgment and granting the Partnerships' motion.[5]  The Bank appeals the circuit court's order.

¶14   Additional material facts will be mentioned in the following discussion.

## DISCUSSION

¶15   The Bank argues that the circuit court erred in granting summary judgment to the Partnership and denying the Bank's motion for summary judgment because the Partnership's counterclaim is barred by the doctrine of laches.  In addition, according to the Bank, if laches does not bar the Partnership's counterclaim, the Bank is entitled to summary judgment because Marjorie had actual and apparent authority to execute the Guaranties and Mortgages on behalf of the Partnership.  In the alternative, the Bank contends that neither party is entitled to summary judgment because there are genuine disputes of material facts concerning each of those issues.  We begin by setting forth governing principles and our standard of review regarding summary judgment.

### I.  Governing Principles and Standard of Review for Summary Judgment.

¶16   We review a circuit court's decision granting or denying summary judgment independently, but we apply the same methodology as the circuit court.

---

[5] Specifically, the circuit court dismissed the following three counts of the Bank's complaint:  count three (breach of contract based on the Guaranties), count four (foreclosure claim), and count five (equitable reformation of property identified in the Mortgages).  The court also granted the Partnership's first counterclaim (quiet title) and dismissed as moot count six of the Bank's complaint (partition of the Partnership's property) and the Partnership's second counterclaim (equitable allocation of assets).

*Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶14, 281 Wis. 2d 448, 699 N.W.2d 54. On summary judgment, the moving party is entitled to judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2019-20)[6]; *see Bank of N.Y. Mellon v. Klomsten*, 2018 WI App 25, ¶31, 381 Wis. 2d 218, 911 N.W.2d 364. "The purpose of the summary judgment procedure is not to try issues of fact but to avoid trials where there is nothing to try." *Rollins Burdick Hunter of Wis., Inc. v. Hamilton*, 101 Wis. 2d 460, 470, 304 N.W.2d 752 (1981).

¶17    In reviewing the parties' motions for summary judgment, we apply the following methodology.[7]  We consider the moving party's affidavits or other proof to determine whether the moving party has made a prima facie case for summary judgment under WIS. STAT. § 802.08(2). *L.L.N. v. Clauder*, 209 Wis. 2d 674, ¶14, 563 N.W.2d 434 (1997).  If a moving party has made a prima facie case for summary judgment, "the opposing party must show, by affidavit or other proof, the existence of disputed material facts or undisputed material facts from which reasonable alternative inferences may be drawn that are sufficient to entitle the opposing party to a trial." *Id.*

---

[6] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[7] The initial step in summary judgment methodology is to examine the pleadings to "determine whether a claim for relief is stated and whether a material issue of fact is presented." *L.L.N. v. Clauder*, 209 Wis. 2d 674, ¶13, 563 N.W.2d 434 (1997).  Here, the parties do not dispute that this step has been satisfied.

¶18 "A factual issue is 'genuine' if the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." ***Strasser v. Transtech Mobile Fleet Serv., Inc.***, 2000 WI 87, ¶32, 236 Wis. 2d 435, 613 N.W.2d 142. When determining whether there is a "genuine issue of material fact," the affidavits and other proof submitted by the parties "are viewed in a light most favorable to the opposing party." ***L.L.N.***, 209 Wis. 2d 674, ¶15. Additionally, in deciding whether there are factual disputes, "the circuit court and the reviewing court consider whether more than one reasonable inference may be drawn from undisputed facts; if so, the competing reasonable inferences may constitute genuine issues of material fact." ***H & R Block E. Enters., Inc. v. Swenson***, 2008 WI App 3, ¶11, 307 Wis. 2d 390, 745 N.W.2d 421.

¶19 In this matter, each party has moved for summary judgment, but that does not require this court to grant summary judgment to either party. "When confronted with cross-motions for summary judgment, the reviewing court must rule on each party's motion on an individual basis." ***American Trucking Assocs., Inc. v. State***, 205 Wis. 2d 494, 499 n.4, 556 N.W.2d 761 (Ct. App. 1996). "Each motion must be denied if material factual issues exist as to the motion." ***Id.***

## II.  Laches.

¶20 The parties dispute whether the Partnership's counterclaim regarding the invalidity of the Guaranties and Mortgages is barred pursuant to the doctrine of laches and whether there are genuine disputes of material fact which require a trial. We begin by setting forth governing principles concerning laches.

9

## A. Governing Principles.

¶21    "Laches is an affirmative, equitable defense designed to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." *Wisconsin Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101.  This defense is founded on the notion that "equity aids the vigilant, and not those who sleep on their rights to the detriment of the opposing party." *State ex rel. Wren v. Richardson*, 2019 WI 110, ¶14, 389 Wis. 2d 516, 936 N.W.2d 587.

¶22    In Wisconsin, the Bank must prove each of the following three elements:  (1) unreasonable delay by the Partnership; (2) lack of knowledge on the part of the Bank that the Partnership would assert the right on which it bases its counterclaim;  and  (3) prejudice  to  the  Bank  caused  by  the  Partnership's unreasonable delay.  *See State ex rel. Coleman v. McCaughtry*, 2006 WI 49, ¶20, 290 Wis. 2d 352, 714 N.W.2d 900, *opinion clarified on denial of reconsideration*, 2006 WI 121, 297 Wis. 2d 587, 723 N.W.2d 424.  Whether the party seeking laches has satisfied its burden of proving each element is a question of law. *Brennan*, 393 Wis. 2d 308, ¶12.

¶23    When the application of laches is presented on a motion for summary judgment, a court may conclude as a matter of law that all three elements are met if the facts are undisputed and only one reasonable inference can be drawn from the undisputed facts.  *Sawyer v. Midelfort*, 227 Wis. 2d 124, 159, 595 N.W.2d 423 (1999).  However, if material facts are disputed, or more than one reasonable inference may be drawn from the facts, then summary judgment must not be granted on the application of laches.  *Id.*

**B. Genuine Issues of Material Fact and Reasonable Competing Inferences Preclude Summary Judgment on Laches.**

¶24 Based on our de novo review of the summary judgment record, we conclude that there are disputed issues of material fact and "undisputed material facts from which reasonable alternative inferences may be drawn" as to each of the three elements of laches. *See L.L.N.*, 209 Wis. 2d 674, ¶14. Accordingly, summary judgment cannot be granted to either party. *See Sawyer*, 227 Wis. 2d 124, 159. We next address each element of laches.

1. Unreasonable Delay.

¶25 In the context of laches, "[w]hether a delay is reasonable is case specific; we look at the totality of circumstances." *Wren*, 389 Wis. 2d 516, ¶18; *Brennan*, 393 Wis. 2d 308, ¶14 ("What constitutes a reasonable time will vary and depends on the facts of a particular case."). In deciding whether a delay is unreasonable, a court must determine when the "delay clock started running"—*i.e.*, when a party either knew or should have known that he or she had a potential claim. *Wren*, 389 Wis. 2d 516, ¶¶20, 21.

¶26 In making that determination about a potential claim, courts focus on "what [he or she] might have known with the exercise of reasonable diligence." *Id.*, ¶20. The parties agree that the knowledge of the Sisters, or what they might have known with reasonable diligence, is material to this element. In other words, the Sisters are "chargeable with such knowledge as [they] might have obtained upon inquiry, provided the facts already known by [them] were such as to put a [person] of ordinary prudence upon inquiry." *Id.* (quoting *Melms v. Pabst Brewing Co.*, 93 Wis. 153, 174, 66 N.W. 518 (1896)); *see also* 27A AM. JUR. 2D *Equity* § 139 ("Laches may … be invoked only after [a party] discovers or with

reasonable diligence could have discovered the facts giving rise to his or her cause of action.").[8]

¶27    There are disputed material facts, and competing reasonable inferences, regarding the Sisters' knowledge of their potential claim against the Bank, which we now summarize.  First, the parties dispute when the Sisters had knowledge of the alleged invalidity of the Guaranties and Mortgages.  The Bank argues that the Sisters had such knowledge years before their July 2018 letter to the Bank just after Marjorie died, which for the first time expressly questioned whether Marjorie "had the legal authority to sign these Mortgages."  More specifically, the Bank makes this contention because the Sisters knew "that the Mortgages existed, that Marjorie had signed them, and that the Sisters (purportedly) had not consented."  The Bank further supports this argument by referencing a 2014 email in which one of the Sisters stated to the other Sisters that their attorney thought Markham was "on thin ice" by allowing Marjorie to unilaterally execute those documents.  That sister testified that she interpreted this statement from the attorney as meaning "that he doesn't think the paperwork was done properly, legally, correctly."  Moreover, regarding the reasonable diligence of the Sisters and as already noted, the Sisters have testified that as of June 2017, they did not ask further questions about the mortgages because they were busy with their own lives and did not want to quiz Marjorie or Edwin about Partnership business.  The Partnership responds that the Sisters did not have a "clear understanding" of the invalidity of the Guaranties and Mortgages and were

---

[8] This treatise is cited on the specific topic of the laches doctrine with approval by our supreme court in *State ex rel. Wren v. Richardson*, 2019 WI 110, ¶¶14, 18, 20, 32, 34, 389 Wis. 2d 516, 936 N.W.2d 587.

investigating that issue at least until their July 2018 letter to the Bank. According to the Partnership, the attorney's 2014 statement that Markham was "on thin ice" does not demonstrate the Sisters' knowledge of such invalidity because the attorney also stated to the Sisters that he was going to investigate the matter further.

¶28    These assertions indicate that there are disputed material facts and competing reasonable inferences as to whether the Sisters knew, or reasonably should have known, of the purported invalidity of the Guaranties and Mortgages prior to the Partnership's letter to the Bank in July 2018. Also, the Sisters' decision not to ask further questions of the Bank, Marjorie, and Edwin could lead a finder of fact to reasonably conclude that the Sisters were not reasonably diligent in obtaining further information. From one perspective, the Sisters' conversations and suspicions during that time—including the 2014 email about Markham being "on thin ice"—could lead a finder of fact to reasonably infer that the Sisters had sufficient knowledge that Marjorie arguably lacked authority to execute the Guaranties and Mortgages. From another perspective, however, the Sisters' conversations and testimony could lead a finder of fact to reasonably infer that the Sisters may have suspected wrongdoing, but could not at that point have reasonably known whether the Guaranties and Mortgages were invalid. These competing inferences demonstrate that a grant of summary judgment on this issue is not appropriate because there are disputes regarding the timeline of the Sisters' knowledge of their potential claim and what a reasonable person should have done in that situation. Only after those factual questions are resolved may a court determine whether the Sisters' delay was reasonable in these circumstances.

¶29    Second, there is a genuine issue of material fact as to whether the Bank induced the Sisters' delay. *See Dickau v. Dickau*, 2012 WI App 111, ¶12,

13

344 Wis. 2d 308, 824 N.W.2d 142 (holding that concealment of information by the party asserting laches may be relevant to whether the opposing party unreasonably delayed in bringing their claim); 27A AM. JUR. 2D *Equity* § 140 ("[L]aches is not available where the defendant has engaged in concealment, misleading tactics, and misrepresentation, or where at least part of the delay is attributable to the defendant."). The Partnership argues that, even if it delayed in "formally escalating a challenge" to the Guaranties and Mortgages, it did so because Markham "convinc[ed] the Sisters that no challenge would be necessary." In support, the Partnership points to the Sisters' 2017 meeting with Markham. He made statements at the meeting which the Sisters interpret as Markham meaning that the Bank would not foreclose on the Partnership's property or enforce the Guaranties. For example, the Partnership references the following comments by Markham, transcribed from a recording made of the 2017 meeting: "[A]t the end of the day, I have no desire whatsoever to collect any Goddamn land, none"; and "[Edwin] can sell [land] and pay his debt off. If he can pay his debt off, I'm good. I just want my loan paid off." The Bank responds that these comments do not suggest that the Bank would not foreclose on the Partnership's property or call in the Guaranties, but only that Markham hoped such an event would not occur.

¶30 Markham's comments in 2017 that the Sisters reference are susceptible of competing reasonable inferences. On one hand, a finder of fact could reasonably interpret those comments as suggesting to the Sisters that challenging the validity of the Guaranties and Mortgages would not be necessary in these circumstances. On the other hand, a finder of fact could reasonably interpret Markham's comments as merely expressing optimism that the loans would be paid off without foreclosure of Partnership property or executing on the

Guaranties signed by Marjorie, but not leading the Sisters to wait on challenging the agreements.

¶31 Because there are disputed material facts and competing reasonable inferences, we cannot on this record as a matter of law determine whether the Partnership's delay, if any, was unreasonable.

## 2. The Bank's Knowledge.

¶32 The second element of laches requires "lack of knowledge on the part of the party asserting the defense that the other party would assert the right" which forms the basis of that party's claim. *Coleman*, 290 Wis. 2d 352, ¶20; *Zizzo v. Lakeside Steel & Mfg. Co.*, 2008 WI App 69, ¶7, 312 Wis. 2d 463, 752 N.W.2d 889 (stating that this element requires a lack of knowledge "by the party asserting laches that a claim for relief was forthcoming."); *Watkins v. Milwaukee Cnty. Civ. Serv. Comm'n*, 88 Wis. 2d 411, 423, 276 N.W.2d 775 (1979) (holding that defendant had knowledge that plaintiff would file suit because the plaintiff told the defendant that "litigation would be commenced" if the defendant did not take a particular action). Here, the Bank's knowledge is related to both the delay of the Sisters (discussed immediately above) and prejudice to the Bank (discussed in the next section of this opinion). *See Trump v. Biden*, 2020 WI 91, ¶23 n.10, 394 Wis. 2d 629, 951 N.W.2d 568, *cert. denied*, 141 S. Ct. 1387 (2021) (stating that the lack of knowledge element focuses "on the ability of the asserting party [(here, the Bank)] to mitigate any resulting prejudice when notice [from the Sisters] is provided.").

¶33 The Bank asserts that until, at the earliest, days after Marjorie's death in July 2018, it lacked knowledge that the Partnership would assert its purported right to commence legal proceedings challenging the validity of the

15

Guaranties and Mortgages. The Bank relies on the following portions of the record.

¶34 In 2013, a letter sent to the Bank by an attorney on behalf of the Sisters in 2013 requested pertinent documents and, after the agreements were produced by the Bank, the attorney stated to the Bank in response:

> The Mortgages let us know which of the partnership land is encumbered and it would appear all of it is.
>
> ….
>
> Next, in order for the partners to make an evaluation of their position it would be important to know the current loan balances, the value of other collateral that is available to you and a clear statement as to the priority as to that collateral….
>
> Maybe most important from your observation point is how are things moving in the operation. You have commented to me over the phone but I would like you to get it in letters that I can pass on to the partners.

Further, after the Sisters met with Markham in June 2017, one of the Sisters acknowledged the Mortgages' validity (according to the Bank's view) when she called Markham to ask whether the Mortgages would be released following the Bank's receipt of life insurance proceeds following Edwin's death in 2017. In three emails sent between October 2017 and May 2018, the Sisters' attorney requested information about the loans, copies of documents, and information on the life insurance on Edwin's life. Those emails culminated in the following statement from the Sisters' attorney: "It's my understanding that the Bank received the Ed Herman life insurance proceeds paying down the loan by $3.5M. The partnership would like to know where the Bank is in the process of releasing the mortgages on the James Herman Partnership Property? An update and plan of attack would be appreciated." According to the Bank, those emails establish that

16

the Sisters treated the Guaranties and Mortgages as valid because the Sisters asked for their loan obligations to be released following the payment of Edwin's life insurance proceeds.

¶35 The Partnership makes the general assertion on appeal that the Sisters "immediately and overtly signaled" to the Bank the Partnership's challenge to the validity of the Guaranties and Mortgages starting when the Sisters' attorney requested copies of those documents in 2013. However, as detailed in the previous paragraph, the record arguably does not support that general assertion. Nonetheless, the Partnership also points to portions of the Sisters' June 2017 meeting with Markham in which, in the view of the Sisters, the Sisters discussed with Markham whether those documents were authorized under the Partnership Agreement. Those transcribed statements to Markham by the Sisters at that meeting were:

> MS. LAUFENBERG: Were you aware that the three of us didn't even know that the land, our partnership land, was mortgaged for --
>
> ….
>
> MS. LESLIE: Did you have a copy of the partnership agreement?
>
> MR. MARKHAM: I do.
>
> MS. LESLIE: So in there where it states that all members needed to sign --
>
> ….
>
> MS. SUTKAY: But right here it says, "No partner shall voluntarily cause the sale or mortgage of substantially all of the assets of the partnership or the dissolution without the unanimous consent of all partners."
>
> ….

17

MS. LAUFENBERG: But we were never give[n]
copies.

¶36    There are reasonable competing inferences as to when the Bank knew that the Partnership would challenge the validity of the Guaranties and Mortgages.  A finder of fact could reasonably infer from the June 2017 meeting and the subsequent emails from the Sisters' attorney to Markham from October 2017 to May 2018 that the Sisters were merely requesting information and asking that Edwin's life insurance proceeds be applied to the loans, rather than indicating that the Sisters planned to assert their right to challenge the validity of the Guaranties and Mortgages.  However, a finder of fact could reasonably infer from the comments at the June 2017 meeting that, at some point before the Sisters' attorneys' July 2018 letter just after Marjorie's death, Markham was aware of the potential invalidity of those documents and of the Sisters' intention to commence legal proceedings asserting that invalidity.  Based on these competing reasonable inferences, summary judgment on this element cannot be granted, and the factual disputes must be resolved by the finder of fact.

### 3. Prejudice.

¶37    The third element of laches requires "prejudice to the party asserting the defense in the event the action is maintained."  *Coleman*, 290 Wis. 2d 352, ¶20.  "What amounts to prejudice … depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position."  *Brennan*, 393 Wis. 2d 308, ¶19.  "[P]rejudice to a party … does not mean a party is so disadvantaged that it cannot prosecute its case.  The prerequisite under our law is prejudice due to the delay, i.e., disadvantage to a party."  *Wren*, 389 Wis. 2d 516, ¶38.  One type of prejudice is "evidentiary prejudice."  *Id.*, ¶33.  This type of prejudice arises when a party's delay in

18

bringing an action has curtailed a party's "ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories." ***Id.***

¶38      Of importance to our analysis is that the prejudice to the Bank must be caused by the Partnership's unreasonable delay. ***Brennan***, 393 Wis. 2d 308, ¶19 ("The final element of laches requires proof of prejudice resulting from the claimant's unreasonable delay.").   In other words, the prejudice necessary to invoke laches must have occurred during the "laches period"—*i.e.*, the period starting when the Sisters knew or should have known of a potential claim regarding the validity of the Guaranties and Mortgages and ending when the Partnership ultimately raised the claim.  *See* 27A AM. JUR. 2D *Equity* § 147 ("The prejudice that a party claims generally must have occurred during or be attributable to the laches period.…   Prejudice cannot be based on a change of position occurring before the complainant could have and reasonably should have brought suit.").[9]

¶39      The parties dispute whether the deaths of Edwin and Marjorie caused evidentiary prejudice to the Bank.  We are unable to determine on this record whether those deaths are prejudicial to the Bank because we are unable to determine on this record whether those deaths occurred during the "laches period." As explained above with respect to the unreasonable delay element, there are genuine issues of material fact and competing inferences as to when the Sisters knew, or should have known, of the potential invalidity of the Guaranties and

---

[9] Our supreme court has referred to the laches period as when the "delay clock started running." ***Wren***, 389 Wis. 2d 516, ¶¶20, 21.

Mortgages. Therefore, whether the deaths of Edwin and Marjorie were prejudicial to the Bank depends on the finder of fact's determination about whether the Partnership unreasonably delayed in raising its claim and, if so, when that delay began and ended.

¶40    Nonetheless, in order to provide guidance to the parties and the circuit court following remand, we address whether the deaths of Edwin and Marjorie would be prejudicial to the Bank if those deaths occurred during the laches period. For the following reasons, we conclude that the deaths of Edwin and Marjorie are prejudicial to the Bank as a matter of law if those deaths occurred during the laches period.

¶41    Our supreme court has stated that the "unavailability of essential witnesses" is a "'classic element[]' of prejudice in a laches defense." *Wren*, 389 Wis. 2d 516, ¶34. The court has also stated, "[t]he doctrine of laches is peculiarly applicable where the difficulty of doing justice arises through the death of the principal participants in transactions complained of, or of witnesses to transactions …. [I]t may be difficult or impossible for the party to defend a claim if essential witnesses are deceased." *Id.* In *Wren*, the court concluded that "[t]he death of the essential witness to the events at issue, along with the loss of his documentary files, unquestionably satisfies this standard." *Id.*, ¶38.

¶42    We disagree with the Partnership's assertion that the Bank was not prejudiced because the testimony of Edwin and Marjorie would not have been relevant as to the validity of the Guaranties and Mortgages. Rather, we agree with the Bank that Edwin and Marjorie were "principal participants" in the execution of the Guaranties and Mortgages and their testimony would have been relevant as to whether Marjorie was authorized to execute those documents. As some examples,

the testimony of Edwin and Marjorie would have been of consequence to the following issues that are discussed later in this opinion: whether the Sisters and Edwin intended to grant such authority to Marjorie in signing the POA; whether Marjorie intended to sign the Guaranties and Mortgages in her representative capacities as trustee for two trusts; whether the Guaranties and Mortgages were executed in the "course of business" of the Partnership; and whether any partners verbally consented to the execution of those agreements. These examples are sufficient to establish evidentiary prejudice to the Bank.

¶43 We are also not persuaded by the Sisters' unsupported assertion that Marjorie's testimony would have been entirely harmful to the Bank. This argument is necessarily speculative, and a similar argument was rejected in *Wren*. In that case, Wren argued that the death of a witness was not prejudicial because Wren submitted that the witness would have testified in his favor. *Id.* Our supreme court rejected Wren's argument and held that the defendant was prejudiced, explaining that the defendant "had no tools and no evidence to defend [Wren's] claim" and that the only available evidence was a "one-sided story." *Id.*, ¶36; *see also Zizzo*, 312 Wis. 2d 463, ¶20 ("*Of course* he does not know [the information known by the deceased witnesses]—and that is exactly how he is prejudiced."). Similarly here, without Marjorie's testimony, the Bank is prejudiced, in part, because it has less evidence to defend against the Sisters' assertion that Marjorie's testimony would have harmed the Bank.

¶44 Accordingly, we are unable to conclude whether the Bank was prejudiced as matter of law because there remain factual disputes as to whether the Partnership unreasonably delayed and, if so, when that delay began and ended. Nonetheless, if the finder of fact determines that the Sisters knew or should have known of the potential invalidity of the Guaranties and Mortgages prior to the

deaths of either Edwin or Marjorie, we conclude that the Bank is prejudiced as a matter of law.

¶45    In sum, the circuit court erred in granting summary judgment to the Partnership on the issue of laches based on its determination that laches could not apply on this record.[10]

### III.  Actual Authority.

¶46    The Bank argues that, if the Partnership's counterclaim is not barred by laches, the Bank is entitled to summary judgment because Marjorie was authorized to execute the Guaranties and Mortgages pursuant to terms in the Partnership Agreement and the POA.  As an alternative to that argument, the Bank asserts that there are genuine disputes of material fact which require a trial on this issue.

¶47    This question requires us to interpret the Partnership Agreement, the POA, and the Authorization.  We begin by setting forth governing principles and our standard of review regarding the interpretation of those documents.

### A.  Standard of Review and Governing Principles.

¶48    Partnership agreements and powers of attorney are generally subject to the same rules of interpretation as other contracts.  *Heck & Paetow Claim Serv., Inc. v. Heck*, 93 Wis. 2d 349, 359, 286 N.W.2d 831 (1980) (partnership

---

[10] Even if the party seeking laches proves all three elements, a "court may—in its discretion—choose not to apply laches if it determines that application of the defense is not appropriate and equitable." *Wren*, 389 Wis. 2d 516, ¶15.  The circuit court did not reach this question.  Because we conclude that there are genuine issues of material fact regarding the elements of laches, we do not consider this issue.

agreements); ***Schmitz v. Firstar Bank Milwaukee***, 2003 WI 21, ¶22, 260 Wis. 2d 24, 658 N.W.2d 442 (powers of attorney).[11]  The interpretation of a contract presents a question of law that this court determines independently of the circuit court.  ***Tufail v. Midwest Hosp., LLC***, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586.

¶49    "The primary goal in contract interpretation is to give effect to the parties' intentions." ***Seitzinger v. Community Health Network***, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426.  "We ascertain the parties' intentions by looking to the language of the contract itself." ***Id.***  The language of the contract must be "interpreted consistent with what a reasonable person would understand the words to mean under the circumstances." ***Id.***  "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms." ***Tufail***, 348 Wis. 2d 631, ¶26.

¶50    Whether a contract is ambiguous is a question of law that this court reviews de novo.  ***Chapman v. B.C. Ziegler & Co.***, 2013 WI App 127, ¶2, 351 Wis. 2d 123, 839 N.W.2d 425.  "A contract is ambiguous when its terms are reasonably susceptible to more than one interpretation." ***BV/B1, LLC v. InvestorsBank***, 2010 WI App 152, ¶19, 330 Wis. 2d 462, 792 N.W.2d 622.  When a contract is ambiguous, a court may "look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent." ***Town Bank v. City Real Est. Dev., LLC***, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476.  In such circumstances, the contract's interpretation presents a question of fact for the

---

[11] The parties agree that the pertinent agreements are interpreted pursuant to Wisconsin law.

finder of fact. *Id.*, ¶32. Accordingly, "when a court determines that a contract's terms are ambiguous and the intent of the parties is in dispute, summary judgment is not appropriate." *BV/B1*, 330 Wis. 2d 462, ¶19; *see also Chapman*, 351 Wis. 2d 123, ¶2 ("Summary judgment is not appropriate when the issue turns on the terms of an ambiguous contract *and* the contracting parties' intent is both: (1) not clear, and (2) disputed.").

### B.  Applicable Provisions of the Partnership Agreement.

¶51     In the context of Marjorie's authorization to enter into the terms of the Guaranties and Mortgages on behalf of the Partnership, the parties discuss two provisions of the Partnership Agreement. One provision states: "No Partner shall voluntarily cause the sale or mortgage of substantially all of the assets of the Partnership … without the unanimous consent of all Partners."[12]     Another provision states:

> No Partner shall, without the prior written consent of all other Partners make, draw, accept or endorse any bill of exchange, promissory note or other engagement for the payment of money for or on behalf of the Partnership or guarantee any debt or account on behalf of the Partnership, except in the course of the business of the Partnership.

The Bank contends, and the Partnership does not dispute, that pursuant to those provisions, Marjorie had authority to do the following: (1) with written consent of all partners, mortgage substantially all assets of the Partnership; (2) with written

---

[12] The Bank does not assert in this appeal that there was verbal consent. Accordingly, our discussion is limited to whether there was unanimous written consent of Marjorie's execution of the Guaranties and Mortgages.

In addition, the Partnership asserts that the Mortgages placed liens on substantially all of the assets of the Partnership. The Bank does not dispute the point, and we will assume without deciding that the Mortgages placed liens on substantially all of the assets of the Partnership.

consent of all other partners, guarantee debts on behalf of the Partnership; and (3) without written consent of the other partners, guarantee debts on behalf of the Partnership if the guarantee is in the course of the business of the Partnership.[13]

¶52    We first discuss the parties' contentions regarding prior written consent of the other partners.

### C.  Written Consent.

¶53    The Bank asserts that Marjorie had prior written consent to enter into the Guaranties and Mortgages based on the POA signed by the Sisters and Edwin and based on Marjorie's position as trustee for the Marital Trust and Family Trust. As a result, according to the Bank, Marjorie's signatures on the Guaranties and Mortgages constituted not only her own consent, but also her consent in her representative capacity on behalf of all other partners.  The Partnership disagrees.

### 1.  Marjorie's Authority Pursuant to the POA.

¶54    The parties dispute whether the terms of the POA signed by the Sisters and Edwin authorized Marjorie to execute the Guaranties and Mortgages. This dispute centers on the following terms of the POA, with emphasis added on two key phrases:

> WHEREAS, Marjorie Herman, Edwin Herman, Renee Laufenberg, Gail Leslie and Penny Sutkay are partners in a family partnership known as JAMES (JIM) HERMAN FAMILY PARTNERSHIP ….

---

[13]  Section 12.04 of the Partnership Agreement binds all successor partners.  As noted, the 1983 amendment to the Partnership Agreement adds the Sisters and Edwin as partners, but it does not amend the Partnership Agreement in any way material to the issues before this court.

> WHEREAS, said family partnership is the owner of real estate in Dane County and occasionally partnership real estate is sold or real estate may be purchased.
>
> The undersigned hereby appoint Marjorie Herman … as the agent … for me *in any lawful way* with respect to *all real property transactions* of said family partnership.
>
> ….
>
> I agree that any third party who receives a copy of this document may act under it. Revocation of the power of attorney is not effective as to third party until the third party learns of the revocation. I agree to reimburse the third party for any loss resulting from claims that arise against the third party because of reliance on this power of attorney.

The phrase "all real property transactions" is not defined in the POA. The Bank argues that the language of the POA is "broad and unambiguous" and that the phrase "all real property transactions" includes mortgaging land and guaranteeing debt regarding real property transactions. The Partnership responds that the phrase "all real property transactions" does not include mortgaging land or guaranteeing debts because the term "transaction" should be interpreted as meaning only "[a]n instance of buying or selling" real estate.

¶55 We conclude that a proper interpretation of the POA cannot be performed on summary judgment because on this record, and for the reasons that we now discuss, it is ambiguous as to whether the POA authorized Marjorie to execute the Guaranties or Mortgages. *See **BV/B1**, 330 Wis. 2d 462, ¶19.

¶56 First, the phrase "all real property transactions" as used in the POA is reasonably susceptible of more than one interpretation. From one perspective, the phrase broadly encompasses "any lawful way" (using another phrase from the POA) of conducting business in a manner that relates to real property. From that perspective, such actions could include common real property transactions such as

26

guaranteeing a loan debt and mortgaging real property to secure the payment of that debt. *See Transaction*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "transaction" as "1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. 2. Something performed or carried out; a business agreement or exchange. 3. Any activity involving two or more persons."). In addition, the POA refers to the Partnership and, implicitly at least, to the Partnership Agreement. Section 9.01 of the Partnership Agreement recognizes mortgages as part of the determination of a sale price of a Partnership interest. These terms of the POA and the Partnership Agreement support the Bank's reading of the POA. From another perspective, however, the phrase "real property transaction" can have a narrower meaning and only encompass instances in which real property is bought or sold. *See Transaction*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/transaction (last visited Oct. 21, 2022) (defining "transaction" as "an occasion when someone buys or sells something, or when money is exchanged or the activity of buying or selling something").

¶57 Second, the latter of the two "whereas" clauses of the POA quoted above ("WHEREAS, said family partnership is the owner of real estate in Dane County and occasionally partnership real estate is sold or real estate may be purchased"), when reviewed with another provision of the POA ("in any lawful way with respect to all real property transactions of said family partnership"), are ambiguous in describing the intent of parties to the POA. *See Levy v. Levy*, 130 Wis. 2d 523, 534, 388 N.W.2d 170 (1986) ("The recital or whereas clause of a contract may be examined to determine the intention of the parties."). According to one reasonable interpretation, the second "whereas" clause—and particularly the statement that "occasionally partnership real estate is sold or real estate may be

purchased"—indicates that the parties intended to limit the POA authorization to only purchases and sales of real estate. According to another reasonable interpretation, however, this statement demonstrates that buying and selling real estate is merely one of the intended purposes of the POA, when interpreted in conjunction with the language in the POA that Marjorie was authorized to act on behalf of those partners "in any lawful way with respect to all real property transactions of said family partnership." From that standpoint, the POA grants to Marjorie authority to enter into Guaranties and Mortgages related to real property.[14]

¶58 Based on these ambiguities in the meaning of the terms of the POA, and the dispute regarding the intent of the parties to the POA, a court must look beyond "the four corners of the contract" and "consider extrinsic evidence to resolve the parties' intent." *See Town Bank*, 330 Wis. 2d 340, ¶33. Neither party, on this record, makes a developed argument based on extrinsic evidence regarding the meaning of the ambiguous terms of the POA. Therefore, the interpretation of

---

[14] The Sisters assert that the POA was limited to a specific project that never came to fruition, that they were not allowed by Marjorie to read the POA before signing it, and that they felt forced by Marjorie to sign it. But, those assertions have no accompanying argument to show that the assertions make a difference to the analysis or result. The Partnership does not develop these arguments and, as a result, we need not consider those further. *State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) (this court need not consider undeveloped arguments). Moreover, the presence of the Sisters' signatures on the POA, and the language in the POA that it could be revoked at any time in writing by the Sisters, are inconsistent with the latter two assertions.

that document presents a question of fact for the finder of fact that cannot be resolved on summary judgment. *See id.*, ¶32; *BV/B1*, 330 Wis. 2d 462, ¶19.[15]

### 2. Marjorie's Signature as Written Consent on Behalf of the Trusts.

¶59    The parties also dispute whether Marjorie's signature on the Guaranties and Mortgages constitutes "written consent" of the two partner trusts based on her status as trustee for those trusts.

¶60    The Partnership argues that Marjorie's signature on the Guaranties and Mortgages was not sufficient to bind the two partner trusts because there was no explicit indication that Marjorie was signing on behalf of the partner trusts. The Partnership contends that an individual cannot act on behalf of another in a contract unless that representation is clearly memorialized. According to the Bank, one cannot reasonably construe Marjorie's signature on the Guaranties and Mortgages as simultaneously consenting to those documents in her capacity as partner and on behalf of the Partnership while at the same time withholding consent in her capacity as the trustee for the two partner trusts. We conclude that the issue of the trust partners' consent cannot be resolved on summary judgment.

---

[15] The Partnership also argues that the Bank's reliance on the POA fails because that document was not signed by Marjorie or by anyone on behalf of the Family and Marital Trusts and is thus insufficient to establish unanimous written consent of all partners. However, this argument misconstrues the Bank's position on appeal. The Bank argues not only that Marjorie consented to the Guaranties and Mortgages on behalf of Edwin and the Sisters based on her status as their attorney, but also that Marjorie consented on behalf of the Marital and Family Trusts based on her status as trustee. Also, as the Bank correctly observes, it makes no difference that Marjorie did not sign the POA because the Partnership Agreement requires a partner—here, Marjorie—to have the "prior written consent of all *other* Partners" to enter into the Guaranties and Mortgages or, in the alternative, Marjorie's consent was shown by her signing the Guaranties and Mortgages. (Emphasis added.)

¶61    We now discuss the applicable terms of the Guaranties, Mortgages, and Authorization.  The terms of the Guaranties and the Mortgages represent that Marjorie had the "full power, right and authority to enter into" those agreements. The signature lines for Marjorie in the Guaranties and Mortgages state that she was signing on behalf of the "James (Jim) Herman Family Partnership" as the "managing partner."  Each of the Guaranties and Mortgages includes a section under that signature line labeled "Partnership Acknowledgement."  In each, a notary public—usually Markham—attested that Marjorie acknowledged under oath that the instrument signed is a "free and voluntary act and deed of the partnership" and that she "is authorized to execute" and "in fact executed" the document "on behalf of the partnership."  Moreover, at the time of the first of the Guaranties and Mortgages, Marjorie signed the Authorization which, reasonably summarized, states that she had the authority on behalf of the Partnership to enter into the Guaranties, grant security, and execute security documents.  Immediately before the signature block on that Authorization is the following paragraph:  "I have read all the provisions of this Authorization, and I jointly and severally and on behalf of the Partnership certify that all statements and representations made in this Authorization are true and correct."  Immediately thereafter, Marjorie "**CERTIFIED TO AND ATTESTED**" to those statements by placing her signature on the authorization.

¶62    With those facts in mind, Marjorie's single signature is ambiguous as to whether Marjorie consented to the execution of the Guaranties and Mortgages in her capacity as a trustee.  *Cf. **Germania Nat. Bank of Milwaukee v. Mariner***, 129 Wis. 544, 547-48, 109 N.W. 574 (1906) (holding that an individual's signature on a contract that names only a company as a party creates an ambiguity as to whether the individual intended to sign in a personal capacity

or as a representative of the company).  From one perspective, supported by the fact that the documents do not explicitly mention Marjorie's status as trustee, Marjorie's signature indicates that she consented in her capacity as a partner but leaves open whether she considered her consent to be in her capacity as a trustee.  From another perspective, and based on the language of the documents Marjorie signed and gave to the Bank, Marjorie's signature indicates that she consented to the Guaranties and Mortgages in both her position as a partner and trustee for the Marital and Family Trusts.  That interpretation of Marjorie's actions is that she intended that her signature would bind all necessary entities in order to make the Guaranties and Mortgages valid and enforceable.

¶63    Because the meaning of Marjorie's signature is ambiguous on its face, and because the intent of the contracting parties is disputed, a court must consult extrinsic evidence to determine whether Marjorie intended to consent in her capacity as a trustee.  *See Town Bank*, 330 Wis. 2d 340, ¶33.  On this record, the parties have not directed us to such extrinsic evidence.  Therefore, the meaning of Marjorie's signature presents a question of fact for the finder of fact that cannot be resolved on summary judgment.  *See id.*, ¶32; *BV/B1*, 330 Wis. 2d 462, ¶19.

### D.  The Partnership's Course of Business.

¶64    As noted, the Guaranties may be authorized under the specific terms of the Partnership Agreement if Marjorie executed the Guaranties "in the course of the business of the Partnership."  This provision of the Partnership Agreement is similar to WIS. STAT. § 178.06 (2007-08), which provides, in pertinent part:  "the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on *in the usual way the business of the partnership of which the partner is a member* binds the partnership."

Sec. 178.06(1) (2007-08) (emphasis added).[16] To determine what constitutes the "usual way" or "course" of the partnership's business under this statute, courts may look to the "historical practices consistently followed by the partnership." *Reliable Pharmacy v. Hall*, 54 Wis. 2d 191, 200, 194 N.W.2d 596 (1972). Other considerations include "the character of the business, the usual manner of carrying on such a business, and the manner in which the particular business was in fact carried on." J. WILLIAM CALLISON & MAUREEN A. SULLIVAN, PARTNERSHIP LAW & PRACTICE § 8:3 (2021-22). Additionally, courts may consider provisions in the Partnership Agreement concerning the Partnership's business. *Id.*

¶65    Summary judgment is not appropriate on this record because there are genuine issues of material fact, and reasonable competing inferences, as to the "course of the business of the Partnership." First, the Partnership Agreement contains the following statement regarding the Partnership's business: "The Partnership shall engage in the business of leasing or farming real property, holding investments in farm corporation or any other investment for profit." The Bank asserts that this phrase is broad and encompasses Marjorie's acts in agreeing

---

[16] We note that the language of WIS. STAT. § 178.06 (2007-08) is based on § 9(1) of the Uniform Partnership Act (1914) ("UPA"). *See* UNIF. P'SHIP ACT § 9(1) (UNIF. L. COMM'N 1914). In 1997, the UPA changed the phrase "usual way [of] the business of the partnership" to the phrase "ordinary course [of] the partnership business." *See* UNIF. P'SHIP ACT § 301(1) cmt. (UNIF. L. COMM'N 1997). The comments to § 301(1) explain that "[t]he UPA and the case law use both terms without apparent distinction" and that "[n]o substantive change [was] intended by use of the more customary phrase." *Id.* Because the Guaranties and Mortgages were executed between 2007 and 2010, we apply the version of the statute that was in effect at the time that those obligations were incurred. WIS. STAT. § 178.0110(2)(d)1. ("This chapter shall not, and the corresponding provisions of [WIS. STAT.] ch. 178[] (2013), shall, be applicable with respect to obligations incurred by the partnership prior to [January 1, 2018]."). Thus, in interpreting the Partnership Agreement here, we consult the authorities interpreting § 178.06 (2007-08) and § 9(1) of the Uniform Partnership Act (2014). In addition, we do not construe, and the parties do not ask us to interpret, the phrase "course of business" as used in the Partnership Agreement as different in any material way from the phrase "ordinary course of business" as used in the Uniform Partnership Act.

to the Guaranties and Mortgages. The Bank also contends that the phrase "farm corporation" in the Partnership Agreement refers to JHI. But, the lack of an article before "farm corporation" in the Partnership Agreement leaves less than obvious whether that phrase refers to JHI ("*the* farm corporation") or any corporation that farms ("*a* farm corporation"). Moreover, the Bank asserts that the Guaranties were an "investment for profit" because JHI was related to the Partnership in that partners owned an interest in JHI and, in turn, JHI was a source of profit for the Partnership by renting land from the Partnership. Under one reasonable interpretation of this language, the execution of the Guaranties constituted an "investment" because it facilitated JHI's acquisition of money from the Bank. Under another reasonable interpretation, however, the execution of the Guaranties was not an "investment" because the Partnership did not directly invest money in JHI. Accordingly, we conclude on this record that the statement in the Partnership Agreement regarding the Partnership's business is reasonably susceptible of more than one meaning.

¶66 Second, there is a genuine dispute of material fact regarding the historical practices of the Partnership prior to Marjorie's execution of the Guaranties and Mortgages. The Bank asserts that the Sisters testified in this action that the Partnership was intended to protect JHI, and that the Partnership's land was intended to be used for JHI. The Bank also observes that Marjorie executed at least three other mortgages secured by Partnership property on behalf of the Partnership prior to executing the Guaranties and Mortgages. Based on these facts, a finder of fact could reasonably infer that mortgaging Partnership property to secure JHI's loans and guaranteeing that debt was consistent with the Partnership's historical practices.

¶67   But, as the Partnership asserts, the Sisters also testified that the purpose of the Partnership was to use the Partnership's property to generate income for all partners and to create an inheritance vehicle for James' and Marjorie's children, not to financially assist JHI. The Partnership further observes that Marjorie had never acted on behalf of the Partnership to guarantee mortgage debts prior to her execution of the first of the Guaranties. Based on these assertions, a finder of fact could reasonably infer that mortgaging Partnership property and guaranteeing JHI's debt was not consistent with the Partnership's historical practices. Because there are competing reasonable inferences regarding the Partnership's historical practices, we conclude that the scope of the Partnership's "course of business" is a question of fact for the finder of fact that precludes summary judgment.[17]

---

[17] The Partnership also asserts that the three prior mortgages—which were attached as exhibits to an affidavit supporting the Bank's summary judgment motion—are inadmissible as hearsay because the affiant lacked personal knowledge of those documents. First, we conclude as a matter of law that the copies of those mortgages attached to the affidavit are not hearsay. *Bank of Am. NA v. Neis*, 2013 WI App 89, ¶49, 349 Wis. 2d 461, 835 N.W.2d 527 ("[C]ontracts, including promissory notes, are not hearsay when they are offered only for their legal effect, not 'to prove the truth of the matter asserted.'"). Second, we do not address the Partnership's argument that the affiant lacked sufficient personal knowledge of the mortgages because the Partnership does not adequately develop this argument. *Pettit*, 171 Wis. 2d at 647.

Further, in briefing, the Partnership makes various assertions, but does not tie those assertions to developed arguments that could affect the issues in this appeal. Specifically, the Partnership asserts that Marjorie did not have the title of "managing partner" as mentioned in the Guaranties and Mortgages. The Partnership also alleges that the Bank did not send the Guaranties and Mortgages to Marjorie before she signed those, and she did not have counsel review those before signing. The Partnership further asserts that there was no "meeting" as is referred to in the Authorization which states that the Partnership agreed to certain acts at a meeting "or by other duly authorized action in lieu of a meeting" before the Guaranties and Mortgages were signed. However, the Partnership does not develop arguments regarding how any of these facts, if true, make a difference to the result. Accordingly, we do not consider these as developed arguments and discuss those no further.

### IV. Apparent Authority.

¶68     The parties dispute whether Marjorie had "apparent authority" to execute the Guaranties and Mortgages, even if she lacked actual authority to do so. Whether Marjorie had apparent authority to execute those documents depends on the applicability of WIS. STAT. § 178.06(1) (2007-08), which provides:

> Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom the partner is dealing has knowledge of the fact that the partner has no such authority.

Sec. 178.06(1) (2007-08). To establish whether a partner has apparent authority under § 178.06 (2007-08), two elements must be satisfied: (1) the partner was "apparently carrying on in the usual way the business of the partnership," and (2) the person with whom the partner is dealing lacked knowledge of the absence of express authority. *See Wyss v. Albee*, 193 Wis. 2d 101, 116, 532 N.W.2d 444 (1995).

¶69     Under the first element, as explained earlier, whether Marjorie was acting in the "usual way" of the Partnership's business depends on the historical practices of the Partnership, the character of the business, the usual manner of carrying on such a business, and the manner in which the particular business was in fact carried on. *See Reliable Pharmacy*, 54 Wis. 2d at 200; CALLISON & SULLIVAN, *supra*, § 8:3. Under the second element, a person with whom a partner is dealing must lack actual knowledge that a partner does not have express authority. *See* WIS. STAT. § 178.01(3) (2007-08) ("A person has 'knowledge' of a

35

fact within the meaning of this chapter not only when that person has actual knowledge thereof, but also when that person has knowledge of such other facts as in the circumstances shows bad faith."). The "bad faith" provision of § 178.01(3) (2007-08) "permits the partnership and the non-acting partners to demonstrate third party knowledge through circumstantial evidence that the third party had knowledge," and not "proof of actual subjective knowledge by the third party," which can be "difficult proof" to obtain. CALLISON & SULLIVAN, *supra*, § 8:2. However, this definition of "knowledge" does not include "constructive notice." *Id.*; *see also* 59A AM. JUR. 2D *Partnership* § 210 ("Absent actual knowledge, though, third parties have no duty to inspect the partnership agreement or inquire otherwise to ascertain the extent of a partner's actual authority in the ordinary course of business even if they have some reason to question it.").

¶70 The parties' arguments regarding Marjorie's apparent authority largely rehash arguments that we addressed earlier in this opinion. First, the parties dispute whether Marjorie was "carrying on in the usual way the business of the partnership" when she executed the Guaranties and Mortgages. As we explained with respect to Marjorie's authority under the "course of business" provision of the Partnership Agreement, there is a genuine issue of fact as to whether executing the Mortgages and guaranteeing JHI's debt were consistent with the Partnership's historical practices.

¶71 Second, the parties dispute whether Marjorie in fact lacked authority to execute the Guaranties and Mortgages. As we explained with respect to Marjorie's purported actual authority, there are genuine issues of fact regarding this issue.

¶72 Third, if Marjorie lacked the authority to execute the Guaranties and Mortgages, the parties dispute whether the Bank knew of that fact. As noted, the language of the POA allows third parties to rely on the statements of the Sisters in the POA. This reasonably assumes that others, including a lender who requests a mortgage, will rely on the statements from the Sisters. In addition, with respect to the element of laches regarding the Bank's knowledge of the Partnership's claim, there are genuine issues of fact as to whether the Bank knew that the Partnership would assert its right to challenge the validity of the Guaranties and Mortgages. Accordingly, whether the Bank knew that the Partnership would assert this right necessarily involves determining whether the Bank knew that Marjorie lacked such authority.

¶73 Thus, there are questions of fact regarding Marjorie's apparent authority that preclude a grant of summary judgment.

## CONCLUSION

¶74 For the foregoing reasons, the order of the circuit court granting the motion for summary judgment of the James (Jim) Herman Partnership is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded.

Not recommended for publication in the official reports.